# **EXHIBIT B**

## ASSET PURCHASE AGREEMENT

This AGREEMENT (this "Agreement") is made as of the 15th day of February 2010, by and among NEW DAY BROADBAND LLC, a Nevada limited liability company ("Buyer"), having an office at 3457 Lupine Bush Court, Las Vegas, NV 89135, and BROADSTRIPE, LLC, a Delaware limited liability company, (together with the Affiliates, "Seller"), having an office at 16305 Swingley Ridge Road, Suite 100 Chesterfield, Missouri 63017.

### WITNESSETH:

WHEREAS, the Seller owns and operates the Acquired Systems listed on Schedule 1.1(a) hereto in certain Washington communities; and

WHEREAS, on January 2, 2009 (the "Petition Date"), Seller and certain of their affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), initiating case number 09-10006 (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Seller desires to sell Buyer the assets, property, interests rights and privileges owned or used by Seller and comprising the Acquired Systems, and Buyer desires to purchase the same and assume certain obligations related thereto on the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the respective agreements hereinafter set forth, the parties agree as follows:

### ARTICLE 1
### DEFINED TERMS

Section 1.1    The following capitalized terms used herein shall have the respective meanings set forth below:

(a)    "Acquired Assets" shall have the meaning set forth in Section 2.4.

(b)    "Acquired System" shall mean any System listed on Schedule 1.1(b).

(c)    "Affiliates" shall mean Broadstripe Capital, LLC; MDM Systems Northwest, LLC; Summit Cablevision, L.P.; CP NW1, LLC and CP NW2, LLC.

(d)    "Assigned Contracts" shall mean the contracts, leases, franchise agreements, pole attachment agreements or other agreements relating to the operation of the Acquired Systems and identified on the Schedule of Assigned Contracts listed on Schedule 1.1(d) (the Schedule of Assigned Contracts).

(e)    "Excluded Assets" shall have the meaning set forth in Section 2.5.

(f)    "Multi-System Contract" shall mean any contract, lease, franchise agreement, pole attachment agreement or other agreement that relates to the operation of

any Acquired System and at least one other System that is not an Acquired System listed on Schedule 1.1(f) (Schedule of Multi-System Contracts)

(g)    "Required Consents and Releases" shall mean the consents and releases described in Section 7.6.

(h)    "Sale Order" shall mean an order entered by the Bankruptcy Court (i) approving the terms of this Agreement; (ii) authorizing Seller to consummate the purchase and sale described herein pursuant to 11 U.S.C. § 363 and assume and assign the Assigned Contracts to Buyer pursuant to § 11 U.S.C. 365, free and clear of all free and clear of all Liens in or on the Acquired Assets (including any and all "claims and interests" in the Acquired Assets within the meaning of § 363(g) of the Bankruptcy Code), other than Permitted Liens; (iii) approving the Reimbursement Fee; and (iv) finding that Buyer is a good faith purchaser pursuant to § 363(m) of the Bankruptcy Code.

(i)    "System" shall mean any cable television system operated by Seller or its affiliates, including any pole attachments, subscribers, network, service area or franchise area associated with such system.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase Price.  The purchase price to be paid for the Acquired Assets (the "Purchase Price") shall be (a) $1,200.00, *plus* (b) an amount equal to all customer accounts receivable of the Acquired Systems that are no more than 30 days old as of the Closing Date, including the under-30 day portion of any accounts receivable a portion of which is over 30 days old ("Receivables Amount") as defined by Generally Accepted Accounting Principles (GAAP), *plus or minus* (c) the Pro-Ration Amount (as defined in Section 2.2) (the full amount of (a), (b) and (c) being payable either by Buyer to Seller or by Seller to Buyer, as the case may be, in cash in immediately available funds at the Closing), *plus* (d) the assumption of the Assumed Liabilities.

Section 2.2    Pro-Ration Amount.  Operation of the System until 11:59 p.m. on the day immediately preceding the Closing Date shall be for the account of Seller, and thereafter, shall be for the account of Buyer, and shall reflect the principle that all revenues and refunds, and all costs, expenses and liabilities, attributable to the operation of the System for any period prior to the Closing Date are for the account of Seller, and all revenues and refunds, and all costs, expenses and liabilities attributable to the operation of the System on and after the Closing Date are for the account of Buyer.  Such pro-rations (the aggregate net amount of which being the "Pro-Ration Amount") will include:

(a)    All revenues (including, but not limited to, subscriber prepayments) and all expenses of the Acquired Systems shall be pro-rated as of the Closing Date with the exception of all accounts receivable relating to the Acquired Assets older than 30 days as defined by Generally Accepted Accounting Principles (GAAP) which are included in the Purchase Price in Section 2.1 of this agreement.

(b)     Such pro-rations shall include, but not be limited to, the following: (a) franchise, copyright or other fees, payable with respect to the Acquired Systems or Acquired Assets; (b) pole attachment fees and other rentals and charges, payable in respect of leasehold interests comprising any part of the real property constituting part of the Acquired Assets; (c) property taxes and assessments, levied and assessed against any Acquired Assets; (d) sales and use taxes, payable in respect of CATV service and related sales at retail to subscribers served by the Acquired Systems; (e) advance payments by subscribers served by the Acquired Systems for converters, encoders, decoders, CATV service and related sales; (f) charges for utilities (including but not limited to electricity, fuel, water, sanitation and garbage disposal) and microwave relay and other services and goods furnished to or in connection with the Acquired Systems; and (g) all license fees and regulatory fees payable to the FCC or any governmental authority in respect of the Acquired Systems. Buyer shall arrange for all programming as and from the Closing Date at Buyer's expense.

(c)     All funds of subscribers on deposit with Seller as of the Closing Time and relating to the Acquired Systems, including advance payments and deposits (including any accrued interest on such deposits) by subscribers served by the Acquired Systems for converters, encoders, decoders, cable television service and related sales, will be assumed by and credited to the account of Buyer.

The pro-rations provided for in this Section 2.2 will be made without duplication. In addition, none of the pro-rations provided for in this Section 2.2 will be made with respect to any Excluded Asset or with respect to any item of income or expense related to an Excluded Asset.

Section 2.3     Closing Adjustments.

(a)     The Purchase Price to be paid pursuant to Section 2.1 hereof shall be adjusted, and the charges identified below relating to the operation of the System shall be apportioned, so that Seller and Buyer shall bear responsibility and be entitled to benefit as set forth in this Agreement, including Section 2.2 hereof.

(b)     At Closing. Seller will deliver to Buyer, not less than ten (10) days prior to the Closing Date, a notice (the "Pre-Closing Adjustment Notice") that will specify Seller's good faith estimate of the Receivables Amount and the Pro-Ration Amount, calculated as of the Closing Date and prepared in a manner consistent with Seller's past practices. The Pre-Closing Adjustment Notice will be accompanied by reasonably detailed documentation supporting the calculations set forth therein. Seller will promptly provide Buyer with such other and further documentation in Seller's possession as may be reasonably necessary to support Seller's calculations. Buyer may challenge the contents of the Pre-Closing Adjustment Notice within four (4) business days following delivery if Buyer believes, in good faith, that it is in error or if Buyer has not received the supplemental documentation reasonably requested by Buyer. Buyer and Seller will use good faith efforts to resolve any disputes with respect to the Pre-Closing Adjustment Notice prior to the Closing Date. A disagreement as to the Receivables Amount or the Pro-Ration Amount shall not be grounds to delay Closing or terminate this

Agreement.   In case of such disagreement, Closing shall take place based on the undisputed amounts set forth in the Pre-Closing Adjustment Notice, with any amounts in dispute to be resolved as part of the post-closing adjustments described in Section 2.3(c).

(c)    Post Closing Adjustments.   As soon as practicable following the Closing Date, and in any event within one hundred twenty (120) days thereafter, or at such other time as the parties mutually agree, Buyer shall deliver to Seller Buyer's certificate setting forth Buyer's calculation of the Receivables Amount and the Pro-Ration Amount and the difference, if any, due to Buyer or Seller as a result of differences between the Pre-Closing Adjustment Notice and the amounts thereof as calculated by Buyer (the "Post-Closing Adjustment Notice"). Buyer shall deliver to Seller or Seller's representatives, upon request made by Seller within 10 days after receipt of Buyer's the Post-Closing Adjustment Notice all books and records as Seller may reasonably request for purposes of verifying such calculations. The Post-Closing Adjustment Notice shall be final and conclusive unless objected to by Seller in writing within 30 days after the later of the delivery of the Post-Closing Adjustment Notice or any such books and records timely requested by Seller. Any amounts due to Seller or Buyer shall be promptly paid in cash by Buyer or Seller, as the case may be. Buyer and Seller agree that any unresolved disputes following Closing regarding the Receivables Amount or Pro-Ration Amount shall be submitted to the Bankruptcy Court for adjudication.

Section 2.4    Acquired Assets.   On the Closing Date, pursuant to § 363 and § 365 (and other applicable sections) of the Bankruptcy Code, except as otherwise provided in Section 2.5, and subject to the terms and conditions of this Agreement, Buyer will purchase and acquire from Seller, and Seller will sell, assign, transfer and deliver, or cause to be sold, assigned, transferred and delivered, to Buyer, free and clear of all Liens, other than Permitted Liens, the Acquired Systems, and all property, tangible or intangible, real, personal or mixed, owned or leased by Seller and used in the operation of the Acquired Systems, including, without limitation, subscribers, customer lists, cable plant, Assigned Contracts, customer premise equipment actually located in customers' premises, headend equipment and any spare parts actually located at the Acquired Systems at Closing (collectively, the "Acquired Assets"), including all of Seller's right, title and interest in, to, and under the following assets (subject to all counterparty assignment rights and provisions):

(a)    All customer accounts receivable relating to the Acquired Systems.

(b)    All fixed or tangible assets, including, without limitation, plant, lines, cable, head-end equipment and facilities, amplifiers, vaults and pedestals, grounding and pole hardware, underground pipes and conduits, wire, poles, pole attachments, drops, hookups, encoders, converters, modems, any other customer premise equipment, lasers, traps, transformers, satellite earth receiving dishes and facilities, antennas, receptacles and outlets, head-end buildings, all tower and head-end facilities, test equipment, spare parts, and onsite digital subscriber terminals (with such changes in inventory as may arise in the ordinary course of business) actually located at and used in the operations of the Acquired Systems.

(c)    All transferrable rights, privileges and interests of or relating to the Acquired Systems, including, without limitation, those arising under or by reason of oral or written contracts, agreements and permits or arrangements of lease with respect to personal property, or interests therein, consents, licenses, authorities, certificates, pole attachment agreements and other attachment agreements, agreements with customers and subscribers, copyright notices and signal registration and other statements, filings and submissions under the Communications Act of 1934, as amended by the Telecommunications Act of 1996 and otherwise (the "Communications Act") and the Copyright Act of 1976, as amended (the "Copyright Act"), each as defined herein, permits for crossing over or under highways, railroads and other property, construction and other permits, other licenses (and prepaid expenses for which adjustments are made under this Agreement) and all other agreements, approvals, consents and authorizations used or owned in connection with the operation construction, installation, possession, operation or maintenance of the Acquired Systems and other intangible personal property owned by Seller and used exclusively in connection with the Acquired Systems; *provided, however*, that any such rights, privileges and interests that arose under contracts and agreements shall only be included in this Section 2.4(c) if they are Assigned Contracts.

(d)    All transferable real-property, including, without limitation, land, buildings, easements and agreements or arrangements of lease with respect to real property or interests therein, and rights-of-way and all similar properties owned or held by Seller and used exclusively in connection with the Acquired Systems; *provided, however*, that any such rights, privileges and interests that arose under leases, contracts and agreements shall only be included in this Section (d) if they are Assigned Contracts.

(e)    All transferable ordinances and franchises (including all amendments thereto, requests and applications therefore and submissions or filings in connection therewith, and acceptances and transfers thereof), permits, consents, authority and agreements or arrangements creating or setting forth obligations, rights, privileges or interests issued, granted or undertaken by or with persons or entities related to the Acquired Systems, including, but not limited to governmental authorities or others to construct, maintain or operate the Acquired System or any CATV business related to the Acquired Systems or conduct the activities thereof, in each case held by Seller and used exclusively in connection with the Acquired Systems; *provided, however*, that any such rights, privileges and interests that arose under contracts and agreements shall only be under this Section (e) if they are Assigned Contracts.

Section 2.5    Excluded Assets.    Notwithstanding Section 2.4, the Acquired Assets shall not include any of the following assets of Seller (collectively, the "Excluded Assets"), which shall be excluded from the transactions described herein and retained by the Seller:

(a)    cash and investments,

(b)    any spare parts inventory not actually located at an Acquired System as of Closing,

(c)     fleet, tools and test equipment,

(d)     any property of Seller that is not used for the operation of an Acquired System and any property of Seller that is used both for the operation of an Acquired System and at least one other System that is not an Acquired System,

(e)     billing systems, software and firmware owned by Seller, the right to use billing systems, software or firmware licensed to Seller and intellectual property of the Seller,

(f)     programming agreements,

(g)     any contract, lease, franchise agreement, pole attachment agreement or other agreement that is not an Assigned Contract, including any Multi-System Contract, and

(h)     causes of action that arise in favor of Seller under the Bankruptcy Code, that accrue prior to the Closing, including those causes of action arising under §§ 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "Chapter 5 Causes of Action").

## ARTICLE 3
## ASSUMPTION OF LIABILITIES

Section 3.1     Assumed Liabilities.  In addition to the payment of the Purchase Price as described in Section 2.1, Buyer shall assume and pay, perform and discharge all the liabilities and obligations of Seller arising from and after Closing under the Assigned Contracts (collectively, the "Assumed Liabilities").  For the avoidance of doubt, the Assumed Liabilities shall include all obligations, liabilities and expenses associated with the Assigned Contracts, subject to the pro-rations set forth in Article 2.

Section 3.2     From and after the Closing Date, Buyer shall assume and pay, perform and discharge, and indemnify and hold Seller harmless from and against, the following liabilities, obligations and commitments of Seller relating to the Acquired Systems:

(a)     Obligations to provide CATV service to persons, firms and corporations currently receiving such service from the Acquired Systems under applicable franchises, ordinances, leases and agreements disclosed herein.

(b)     All of Seller's obligations and commitments arising on and after the Closing Date in respect of the operation of the Acquired Systems, it being understood that obligations in respect of the period prior to the Closing Date shall be the obligation of Seller.

(c)     All Seller's obligations arising on and after the Closing Date under the Assigned Contracts.

Section 3.3    Seller hereby agrees to retain and to indemnify and hold harmless Buyer from and against, any and all liabilities and obligations of Seller arising prior to the Closing Date.

Section 3.4    Buyer agrees to indemnify and hold Seller harmless from, and against, any and all liabilities and obligations assumed by Buyer of the Systems arising after the Closing Date.

## ARTICLE 4
## SELLER'S REPRESENTATIONS AND WARRANTIES

Section 4.1    Seller hereby represents and warrants to Buyer as follows, which representations and warranties, together with all other representations and warranties of Seller in this Agreement, are true and correct, in all material respects:

(a)    <u>Good Standing; Authority; Due Authorization; No Conflict</u>.  Seller is a limited liability company, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, operate and lease its properties, to carry on its business as now being conducted as and in the places where such properties are now owned, leased or operated or such business is now conducted, and to enter into this Agreement and perform its obligations hereunder.  The execution and delivery of this Agreement by Seller has been duly and validly authorized and approved by all necessary limited liability company action, and, subject to entry of the Sale Order, this Agreement is valid and binding upon and legally enforceable against Seller in accordance with its terms.  The execution and performance of this Agreement and compliance with the provisions hereof by Seller will not violate any provision of law; subject to entry of the Sale Order and obtaining the Required Consents and Releases, will not, with or without the giving of notice and/or the passage of time, conflict with or result in any breach of any of the terms or conditions of, or constitute a default under, any indenture, mortgage, agreement or other instrument to which it is a party or by which it is bound; and will not result in the creation of any lien, charge or encumbrance upon its assets.

(b)    <u>Qualification</u>.  Seller is qualified to do business in the respective states of formation of each entity and if necessary, in the State of Washington.

(c)    <u>"AS IS; WHERE IS"</u>.  The Acquired Assets are being transferred on the Closing Date, on a "WHERE IS" and, as to condition, "AS IS" basis, and subject to ordinary wear and tear prior to the Closing.

(d)    <u>Title</u>.  Seller has good and marketable title (or, where applicable, a valid and binding leasehold interest in or license to) to the Acquired Assets free and clear of all liens, mortgages, pledges, conditional sale agreements, encumbrances and charges (collectively "<u>Liens</u>") whatsoever, except for liens described in Schedule 4.1 ("<u>Permitted Liens</u>"); liens for current taxes not yet due and payable; and liens in respect of pledges or deposits under workers' compensation laws or similar, statutes.  Subject to entry of the Sale Order and obtaining the Required Consents and Releases, Seller has the right and

power to sell and convey to Buyer good, marketable and, except for the Permitted Liens, unencumbered title (or, where applicable, a valid and binding leasehold interest in or license to) in and to the Acquired Assets. Subject to the entry of the Sale Order, Buyer will be vested with good title to the Acquired Assets, free and clear of all Claims, encumbrances, interests, and Liens other than Permitted Liens and Assumed Liabilities.

(e)    Judgments.  As of the date of this Agreement, there are no judgments outstanding against Seller which affect the Acquired Assets.

(f)    Litigation.  As of the date of this Agreement, and except as set forth on Schedule 2, there are no actions, suits, proceedings or investigations pending or, to the Seller's knowledge, threatened against Seller which affect the Acquired Assets.

(g)    Brokers.  Seller has not incurred any liability for finders', agents' or brokerage fees, commissions or compensation in connection with this Agreement or the Transaction, with the exception of those fees due to DH Capital, LLC, which shall be the sole responsibility of Seller to pay.

## ARTICLE 5
## BUYER'S REPRESENTATIONS AND WARRANTIES

Section 5.1    Representations and Warranties.  Buyer hereby represents and warrants to Seller as follows, which representations and warranties, together with all other representations and warranties of Buyer in this Agreement, are true and correct, in all material respects:

(a)    Good Standing; Authority.  Buyer has the power and authority and legal right to execute, deliver, and perform its obligations under this Agreement and this Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights.

(b)    No Conflict.  The execution, delivery, and performance by Buyer of this Agreement do not and will not violate or conflict with any law, rule, or regulation or any order, writ, injunction, or decree of any court, governmental authority or agency, or arbitrator and do not and will not conflict with, result in a breach of, or constitute a default under, or result in the imposition of any lien upon any assets of Buyer pursuant to the provisions of any indenture, mortgage, deed of trust, security agreement, franchise, permit, license, or other instrument or agreement to which Buyer or its properties are bound.

(c)    Consents.  Except for the Required Consents and Releases, no authorization, approval, or consent of, and no filing or registration with, any court, governmental authority, or third party is necessary for the execution, delivery, or performance by Buyer of this Agreement or the validity or enforceability thereof.

(d)    No Reliance.  Buyer has, independently and without reliance upon Seller and based upon such documents and information as Buyer has deemed appropriate,

made its own analysis and decision to enter into this Agreement, and Buyer is not relying upon Seller to provide (and Seller shall have no duty to provide) any such information to Buyer either now or in the future.

## ARTICLE 6
## ACCESS TO INFORMATION AND DOCUMENTS

Section 6.1    The Seller will give Buyer and Buyer's other representatives full access, during Seller's normal business hours, to all documents, contracts, books and records pertaining to the Acquired Assets and the Acquired Systems, and will furnish Buyer with copies of such documents and with such information with respect to the Acquired Assets and the Acquired Systems and their operations as Buyer may, from time to time, reasonably request. In addition, Seller shall cooperate with Buyer's reasonable requests  in connection with Buyer's efforts to obtain the Required Consents and Releases, provided that Seller shall not be obliged to incur any costs or obligations in connection therewith.

## ARTICLE 7
## COVENANTS

Section 7.1    <u>Operation of Acquired Systems</u>.    Prior to the Closing, Seller covenants that it will (i) conduct the business and affairs of the Acquired Systems in a manner consistent with prior practices in all material respects; (ii) use its commercially reasonable efforts to preserve for the benefit of Buyer the goodwill of its suppliers and customers and others having business relations with it; and (iii) maintain in full force and effect the currently existing (or similar) policies of insurance covering the properties and assets of the Acquired Systems.  Seller will not sell or dispose of any of the Acquired Assets prior to the Closing Date except as may occur in the ordinary course of its business or pursuant to an Order of the Bankruptcy Court. Notwithstanding the foregoing, however, (a) Seller may file motions to reject any contracts, agreements, franchises or leases that are not Assigned Contracts, effective as of the Closing Date; (b) Seller's covenants in this Section 7.1 shall not require Seller to enter into new contracts or agreements or to renew existing ones, to pay greater rates, wages, prices or amounts than Seller is currently incurring or to make any payment on account of amounts incurred by Seller prior to January 2, 2009; and (c) in the event, for reasons not within the reasonable control of Seller, Seller is unable to continue operation of any System listed on Schedule 1(a) between the execution and Closing Date of this Asset Purchase Agreement then (i) the discontinuation of services at such System will not be a breach of this Section 7.1, (ii) Seller shall immediately inform Buyer of such event and Buyer shall have the option of 1) removing the System from Schedule 1(a); or 2) leaving Schedule 1(a) unchanged and acquiring only the movable equipment forming part of such System as Seller has, in its sole discretion without incurring material incremental out-of-pocket costs or any liability or obligations, recovered from such System as of Closing.  If Buyer fails to select Option 2 within ten (10) days of Seller's written notification, it shall be deemed to have selected Option 1.  If Seller discontinues service at any one or more of the following Systems: Anderson Island, Bridgeport, Forks, Darington, Twisp or Waterville, Buyer may terminate this Agreement without recourse between the parties upon written notice to Seller within ten (10) days after such event.

Section 7.2    Compliance with Laws.  Except for matters disclosed in Schedule 7.2, Seller will comply in all material respects with all franchises, ordinances and applicable laws and regulations of all applicable jurisdictions and governmental authorities in respect of the Buyer's Minimum Systems.

Section 7.3    Efforts to Obtain the Required Consents and Releases.  Buyer, with Seller's assistance, shall use commercially reasonable efforts to obtain the Required Consents and Releases and to obtain all the consents and releases that Buyer wishes to have obtained for Closing within the period provided for in Section 7.6(c).  Buyer and Seller may, by mutual agreement, (i) waive all or any of the Required Consents and Releases as a condition of Closing, (ii) extend the period provided for in Section 7.6(c), or (iii) file the motions provided for in Section 7.6(c) without waiving the requirement for Required Consents and Releases as a condition of Closing under Section 9.3(a)(3).  Seller shall use commercially reasonable efforts to assist Buyer in obtaining Required Consents and Releases, but shall not be obligated to incur costs, obligations or liabilities.

Section 7.4    No New Promotions.  Seller will not commence any new marketing campaign or promotion in the Acquired Systems after the date of the execution hereof without the prior written consent and approval of Buyer, which consent and approval will not be unreasonably withheld or delayed.  If Seller sends a notice of a proposed campaign or promotion by email or in writing to Buyer, such approval shall be deemed to have been given by Buyer unless notice to the contrary is received by Seller within five (5) days.

Section 7.5    No Public Announcement.  Prior to the Closing Date, neither party will, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent such party determines that such action is advisable or required by law, in which case such party will so advise the other party, and the parties will use their reasonable efforts to cause a mutually agreeable release or announcement to be issued.  The foregoing shall not prevent Seller from publishing the existence or terms of this Agreement (or the Agreement itself) as necessary in connection with the Bankruptcy Case, including the motions referred to in Section 7.6(c) or prevent Buyer from obtaining any required Consents and Releases

Section 7.6    Required Consents and Releases.

(a)    Buyer, with Seller's assistance, shall obtain from each counterparty to each Assigned Contract all consents to the assumption (with no liability to Seller) and assignment to the Buyer of each Assigned Contract and releases necessary to relieve Seller from any further liability or obligation under each Assigned Contract, including any liability or obligation relating to the shutdown or dismantling of any Acquired System.  In addition, Buyer, with Seller's assistance, shall obtain from each counterparty to each Multi-System Contract all consents and releases necessary to relieve Seller from any further liability or obligation under that portion of any Multi-System Contract that relates to an Acquired System, including any liability or obligation relating to the shutdown or dismantling of any Acquired System.  (The consents and releases referred in this sub-section are hereinafter referred to as the "Required Consents and Releases.")

(b)    Buyer will inform Seller regularly of its progress in obtaining the Required Consents and Releases.  Prior to the occurrence of the Closing Date, Buyer will obtain Seller's prior written approval for any and all communications between Buyer and any subscribers, local franchising authorities, landlords or contract counterparties.

(c)    All Required Consents and Releases will be obtained within forty (40) days of execution of this Agreement.  In the event all Required Consents and Releases in form and substance satisfactory to Buyer and Seller have not been obtained within such period, Seller may terminate this agreement without recourse between the parties.  Upon satisfactory receipt of all the Required Consents and Releases in form and substance satisfactory to Buyer and Seller, Seller will file one or more motions with the Bankruptcy Court requesting approval of this Agreement pursuant to 11 U.S.C. § 363 and of the assumption and assignment to Buyer of the Assigned Contracts pursuant to 11 U.S.C. § 365.

Section 7.7    <u>Post-Closing Operation</u>.    Except for an event not within the reasonable control of Buyer, Buyer shall operate the following Acquired Systems, at a minimum, for not less than three (3) months after the occurrence of the Closing Date: Darrington, Bridgeport, Brewster, Pateros, Anderson Island, Forks, Twisp and Winthrop.  Buyer's failure to satisfy this covenant shall constitute a material breach of the terms of this Agreement.

Section 7.8    <u>Cooperation in Applications for Additional Consents and Authorizations</u>.

(a)    Seller and Buyer will prepare and file, or cause to be prepared and filed, within fifteen (15) days after the date hereof all applications (including FCC Form 327) that are necessary for the assignment to Buyer of any franchises and FCC licenses that are part of the Assets in connection with the consummation of the transactions contemplated by this Agreement.  Such filings shall state that the transfers are subject to the approval of the Bankruptcy Court.  Buyer will pay any fees imposed by the FCC for filing of FCC license transfer applications.  This Agreement will expire without recourse between the parties if the Buyer has not prepared and made the filings required by this sub-section within fifteen (15) days after the date hereof.

(b)    Buyer will promptly furnish to any person or governmental authority from which a Required Consent is requested such accurate and complete information regarding Buyer, including financial information relating to the cable and other media operations of Buyer, as a person or governmental authority may require in connection with obtaining any of the Required Consents and Releases.

(c)    Seller will reasonably cooperate with Buyer in obtaining the Required Consents and Releases.

(d)    Buyer and Seller will execute and deliver such documents as may be reasonably requested for Buyer and Seller to comply with the requirements of their programming Contracts and channel line-up requirements with respect to divestitures of cable television systems.

Section 7.9    Non-Compete.  For a period of five (5) years after the occurrence of the Closing Date, Buyer and Seller agree not to (i) overbuild cable systems owned or operated by the other that are located within 15 miles of any Acquired Systems, or (ii) directly solicit for employment any of the other's employees in Washington or Oregon.

## ARTICLE 8
## BANKRUPTCY APPROVALS

Section 8.1    Sale Order.  As a precondition to closing, the Bankruptcy Court shall have entered the Sale Order, which order will not have been stayed, modified, reversed or amended in any manner adverse to Buyer, and all other orders, approvals and consents from the Bankruptcy Court required to consummate the transactions described herein.  This Agreement shall expire without recourse between the parties if the Sale Order has not been entered within thirty (30) days of the filing of the motion(s) referred to in Section 7.6(c).

Section 8.2    Reimbursement Fee.  In order to induce Buyer to enter into the Agreement, and to maximize the value and Purchase Price for the Acquired Assets, Buyer shall be granted a "Reimbursement Fee" in an amount equal to $30,000, subject to Bankruptcy Court approval, for Buyer's reasonable expenses incurred in connection with the sale.    The Reimbursement Fee shall be payable to Buyer only in the event that the Acquired Assets are sold to any person or entity other than the Buyer, and shall be payable at closing from the first proceeds of the sale of the Acquired Assets to such person or entity, whereupon this Agreement shall terminate without recourse between the parties; *provided, however,* that the Reimbursement Fee shall not be payable in the event that either Buyer fails to obtain the Required Consents and Releases or otherwise breaches the Agreement or the Bankruptcy Court does not approve the Agreement.

## ARTICLE 9
## CLOSING

Section 9.1    Date, Time and Location.  The Closing shall occur on or before 10:00 A.M. local time on April 30, 2010 ("Closing Date") at a mutually agreeable location as may be agreed to by Buyer and Seller. If all conditions for closing cannot be met by the Closing date then this agreement shall expire without recourse. It is understood that time is of the essence.

Section 9.2    Conditions to Buyer's Obligation to Close.  The obligations of Buyer under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of all the following conditions, compliance with which, or the occurrence of which, may be waived in writing, in whole or in part, by Buyer:

(a)    Deliveries.  Seller shall have delivered, or caused to be delivered, to Buyer at the Closing each of the following:

(1)    a fully executed Bill of Sale in substantially the form attached hereto as Exhibit A, and such other documents, assignments and other instruments of transfer or conveyance as may be necessary to evidence and effect the sale,

assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer or as reasonably requested by Buyer;

(2)    possession of the Acquired Assets; and

(3)    any other documents, instruments or agreements reasonably requested by Buyer to effectuate the transfer of the Acquired Assets at Closing.

(b)    <u>Representations, Warranties and Covenants</u>.

(1)    <u>Continued Accuracy of Representations and Warranties</u>.    All representations and warranties of Seller contained in this Agreement will be true and correct in all material respects as of the Closing Date with the same force and effect as if made on and as of the Closing Date, except that those representations and warranties that are made as of a particular time are required to be true and correct only as of that particular time.

(2)    <u>Performance of Agreements</u>.    Seller shall have performed and satisfied all covenants and conditions in all material respects required by this Agreement to be performed or satisfied by it on or prior to the Closing Date.

Section 9.3    <u>Conditions to Seller's Obligation to Close</u>.    The obligations of Seller hereunder are subject to the satisfaction, on or prior to the Closing Date, of all of the following conditions, compliance with which, or the occurrence of which, may be waived, in writing, in whole or in part by Seller.

(a)    <u>Deliveries</u>.    Buyer shall have delivered, or caused to be delivered, to Seller at the Closing each of the following:

(1)    a check or wire transfer for the Purchase Price;

(2)    a fully executed Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit B; and

(3)    all Required Consents and Releases, specifically including the consent of each counterparty to the assignment of the corresponding Assigned Contract and the release of any liability of Seller under each Assigned Contract and Multi-System Contract (as pertains to an Acquired System) and all Required Consents and Releases being in full force and effect as of the Closing Date.

(b)    <u>Representations, Warranties and Covenants</u>.

(1)    <u>Continued Accuracy of Representations and Warranties</u>.    All representations and warranties of Buyer contained in this Agreement will be true in all respects as of the Closing Date with the same force and effect as if made on and as of the Closing Date.

(2)    <u>Performance of Agreements</u>.    Buyer will have performed and satisfied all covenants and conditions required by this Agreement to be performed or satisfied by it on or prior to the Closing Date, including payment of the Purchase Price.

## ARTICLE 10
## OTHER PROVISIONS

Section 10.1    If any party initiates an action to enforce any provision of this Agreement or any agreement, instrument or document made or delivered in connection herewith, or for damages by reason of an alleged breach of any provision hereof or thereof, no matter what the outcome of the action, both parties shall be responsible for their own costs and expenses, including attorney's fees and costs, incurred in' connection with such action.

Section 10.2    Each party shall, subject to the terms of this Agreement, bear its own expenses and costs in connection with its performance and compliance with the terms, conditions, and provisions of this Agreement.

## ARTICLE 11
## NOTICES

Section 11.1    Any notices or other communications to the Seller or the Buyer, shall be sent by mail, or by facsimile machine with report of delivery, or to the addresses set forth above, or to such other address as Seller or Buyer may designate from time to time, by written notice to the other.

## ARTICLE 12
## MISCELLANEOUS

Section 12.1    This writing constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be modified, amended or terminated, except by a written agreement specifically referring to this Agreement-signed-by Buyer and Seller. Buyer acknowledges that it is not relying on any statement, representation, agreement or understanding not embraced or embodied in this Agreement or any Schedule or document delivered, pursuant hereto.

Section 12.2    This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, by operation of law or otherwise, by any party hereto without the prior written consent of the other party. Nothing in this Agreement, express or implied, is intended to confer upon-any person other than the parties hereto and their respective successors and permitted assigns, any rights, remedies or obligations under or by reason of this Agreement.

Section 12.3    The paragraph headings contained herein are for the purposes of convenience only and are not intended to define or limit the contents of said paragraphs. This Agreement may be executed in one or more counterparts, all of which taken together, shall be

deemed one original. This agreement shall be governed and construed in accordance with the laws of the State of Nevada.

Section 12.4    The obligations of each entity constituting the Buyer are joint and several.

IN WITNESS WHEREOF, the parties have duly executed this agreement as of the date and year first above written. Signature page follows:

**By Buyer:**

New Day Broadband LLC

By: Neal Schnog
Its: Manager

**By Seller:**

BROADSTRIPE, LLC
BROADSTRIPE CAPITAL, LLC
MDM SYSTEMS NORTHWEST, LLC
SUMMIT CABLEVISION, L.P.
CP NW1, LLC
CP NW2, LLC

By:
Its:    GUSTAVO A. FRILICK
        CEO
        BROADSTRIPE

**SCHEDULE 1(b)**

**ACQUIRED SYSTEMS**

| Cable TV System |
|---|
| ANDERSON ISLAND |
| BRIDGEPORT |
| CRESTON |
| DARRINGTON |
| FORKS |
| MANSFIELD |
| MARBLEMOUNT |
| PE ELL |
| TWISP |
| WATERVILLE |

## SCHEDULE 1(d)

## ASSIGNED CONTRACTS

| Contract Counterparty | Contract Name | Dated |
|---|---|---|
| City of Bridgeport | An ordinance of the City of Bridgeport, Washington granting a franchise to Summit Communications, Inc. for the construction and operation of a cable system and establishing an effective date | March 9, 1994 |
| City of Brewster | An ordinance of the City of Brewster, Washington granting a franchise to Summit Communications, Inc. for the construction and operation of a cable system and establishing an effective date | March 28, 1994 |
| Town of Waterville | Cable Television Franchise Agreement | November 3, 2008 |
| Town of Mansfield | Cable Television Franchise Agreement | March 14, 2006 |
| City of Twisp | Cable Television Franchise Agreement | January 27, 2007 |
| Town of Winthrop | Cable Television Franchise Agreement | October 7, 1998 |
| Town of Creston | Cable Television Franchise Agreement | April 12, 2005 |
| Town of Darrington | An ordinance granting to Darrington TV Cable Company, a partnership, a franchise to stretch wires and cables and appurtenant structures over and under the streets and alleys of the Town of Darrington and to maintain and use the same as the coaxial cable distribution system for television distribution to subscriber's residences and to business in public establishments | June 12, 1960 |
| Town of Forks | An ordinance of the Town of Forks amending Ordinance No. 1 relating to Franchise for Cable Television Distribution Systems | May 23, 1983 |
| City of Pe Ell | Cable Television Franchise Agreement | August 20, 2007 |
| Douglas County | Cable Television Franchise Agreement | August 14, 2007 |
| Clallam County | Utilities Franchise | January 10, 1995 |
| Public Utility District No.1 of Douglas County | Pole Attachment Licensing Agreement | January 1, 2005 |
| Public Utility District No. 1 of Okanogan County | CATV License Agreement | May 3, 1982 |
| Avista The Washington Water Power Company | Community Television Joint Pole Agreement | March 27, 1989 |
| Okanogan County Electric Cooperative | Joint Use Pole Agreements | January 19, 1984 |
| Peninsula Telecommunications, Inc. | CATV Joint Use Agreement | August 21, 1987 |
| Public Utility District No. 1 | General Agreement for Pole Contracts | January 8, 2008 |

| of Clallam County | | |
|---|---|---|
| Weyerhaeuser Company | Permit<br>Supplemental Agreement | September 3, 1997 |
| Evelyn Hedges Trust | Lease Agreement | January 31, 2006 |
| Town of Mansfield | Lease Agreement | March 28, 2006 |
| Town of Creston | Lease Agreement | May 18, 2005 |
| Dixie White | Headend Lease Agreement | June 23, 2008 |
| City of Forks | Lease | May 1, 1992 |
| Donald & Onalee Stannek | Lease Agreement | January 17, 1983 |
| City of Pateros | Cable Television Franchise Agreement | May 18, 2009 |
| Jim Fitzhugh | Lease Agreement | October 29, 1985 |
| Homeland Fruit Co. | Easement Dead | Unknown |
| Ronald & Joan Prindle | Lease Agreement | July 1, 1982 |
| Allan Slack | Easement Deed | Unknown |
| John Leo | Easement Deed | Unknown |
| RJ Warren | Antenna Site Agreement | November 1, 2006 |
| Tanner Electric | Lease Agreement | January 16, 1990 |
| Blue Spruce Motel | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | May 25, 2000 |
| Cascade Condos | Cable Right of Entry Operating Agreement | June 5, 1998 |
| Dew Drop Inn | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | August 1, 1996 |
| Duck Brand Hotel | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | March 29, 2004 |
| Forks Hwy 101 RV Park | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | July 10, 2007 |
| Hillcrest House | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | December 29, 1997 |
| Idle A While Motel | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | January 24, 1996 |
| Indian Street Trailer Park | Cable Television Agreement | April 1, 1991 |
| Okanogan-Douglas Dist. Hospital | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | May 27, 1997 |
| Orchard View Trailer Park | Cable Right of Entry Operating Agreement | July 31, 1996 |
| River's Edge Resort | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | October 22, 1996 |
| Riverside Lodge | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | July 30, 1996 |
| Stagecoach Inn | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | June 18, 2003 |
| Trails End Motel | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | August 11, 2000 |
| The Virginian Resort | Cable Right of Entry Operating Agreement<br>Cable TV Bulk Rate Agreement | June 22, 2007 |
| | | |

## SCHEDULE 1(f)

## MULTI-SYSTEM CONTRACTS

| Contract Counterparty | Contract Name | Dated |
|---|---|---|
| Snohomish County | Ordinance No. 94-083 Granting a Cable TV Franchise to Summit Communications, Inc. | September 14, 1994 |
| Public Utility District No. 1 of Snohomish County | Pole Attachment License Agreement | January 12, 1999 |
| Lewis County | An ordinance setting forth procedures for the processing of applications for cable communications system franchises and the renewal of existing communications systems | July 22, 1993 |
| Public Utility District No. 1 of Lewis County | Pole Contract Agreement | January 15, 1998 |
| Puget Sound Energy | Pole Attachment Agreement | May 5, 2009 |
| Tanner Electric | Attachments License Agreement | March 21, 2002 |
| Skagit County | Order Granting Application for Franchise No. 12123 | July 10, 1989 |
| Kittitas County | Resolution 89-40 | April 18, 1989 |
| Pierce County | An ordinance of the Pierce County Council finding the proposed non-exclusive cable television franchise to Millennium Digital Media Systems, LLC for a cable network in Pierce County to be in the public interest; setting forth terms and conditions accompanying the granting of the cable franchise; providing for the regulation of construction, operation, maintenance, and use of the network; prescribing remedies for the violation of the provisions of the franchise; and authorizing the County Executive to enter into the franchise agreement | July 13, 2005 |

## SCHEDULE 2

## PENDING LITIGATION

Wavedivision Holdings, LLC and Michigan Broadband, LLC vs. Broadstripe, LLC (f/k/a Millennium Digital Media Systems, L.L.C.), Summit Cablevision, L.P. CP NW 1, L.L.C. and CP NW2, L.L.C.; Superior Court of Washington in and for King County; Case No. 06-2-32115-4SEA

**EXHIBIT A**

**BILL OF SALE**

## BILL OF SALE

This Bill of Sale is made as of _____, 2010, by _____, a Delaware corporation, ("Seller") for the benefit of _____, or its assignee(s) ("Buyer").

Section 1.    <u>Transfer of Assets.</u>

Effective at 12:00 a.m., prevailing Eastern time, on the date hereof, upon the terms and subject to the conditions set forth in that certain Asset Purchase Agreement dated as of _____, 2010 (as amended modified or supplemented, the "Asset Purchase Agreement"),[1] between Seller, Buyer, and the other seller parties thereto, Seller does hereby give, grant, bargain, sell, transfer, assign, convey, and deliver to Buyer all of Seller's right, title and interest in and to the Acquired Assets, including all Acquired Assets identified on the attached Schedules.

Section 2.    <u>Miscellaneous.</u>

(a)    The Asset Purchase Agreement is incorporated herein by reference, shall continue in full force and effect as though set forth herein at length to the extent provided for in the Asset Purchase Agreement, and shall control in the event of any conflict with the terms of this Bill of Sale.

(b)    THIS BILL OF SALE AND ALL DOCUMENTS, INSTRUMENTS, AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE LAWS OF THE STATE OF WASHINGTON, WITHOUT OWING EFFECT TO ANY CHOICE OF LAW OR CONFLICTING PROVISION OR RULE (WHETHER OF THE STATE OF WASHINGTON OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN WASHINGTON TO BE APPLIED.

(c)    A facsimile counterpart signature to this Bill of Sale shall be acceptable and binding.

**IN WITNESS WHEREOF,** Seller has caused this Bill of Sale to be executed by its duly authorized officer as of the day and year first above written.


By:_____
Name:
Title:

---

[1] All capitalized terms not defined herein shall be given the meaning ascribed to them in the Asset Purchase Agreement.

# EXHIBIT B

# ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement"), dated as of _____, 2010, is by and between _____, a Delaware corporation ("Seller") and _____, a Delaware limited liability company, ("Buyer").

**WHEREAS,** pursuant to an Asset Purchase Agreement by and between Buyer and Seller as of _____, 2010 (as amended and in effect from time to time, the "Asset Purchase Agreement"), Buyer has purchased substantially all of the assets of Seller; and

**WHEREAS,** pursuant to the Asset Purchase Agreement, Seller has agreed to assign certain rights and agreements to Buyer, and Buyer has agreed to assume certain obligations of Seller, as set forth herein, and this Agreement is contemplated by the Asset Purchase Agreement;

**NOW, THEREFORE,** for and in consideration of the promises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

(a)    <u>Capitalized Terms.</u>  Capitalized terms not defined herein shall have the meaning ascribed to them in the Asset Purchase Agreement.

(b)    <u>Assumption.</u>  Buyer hereby assumes and agrees to observe and perform all of the duties, obligations, terms, provisions, and covenants, and to pay and discharge all of the liabilities of Seller to be observed, performed, paid, or discharged in connection with the Assumed Liabilities. Buyer assumes no other liabilities, and the Parties hereto agree that all such other liabilities shall remain the sole responsibility of Seller.

(c)    <u>Terms of the Asset Purchase Agreement</u>.  The terms of the Asset Purchase Agreement are incorporated herein by this reference.  If there is a conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

(d)    <u>Further Actions.</u>  Each of the Parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other Party, such further instruments of transfer and assignment and to take such other action as such other Party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Agreement.

(e)    <u>Governing Law; Counterparts.</u>  This Agreement shall be construed and enforced in accordance with the laws (other than the conflict-of-law rules) of the State of Nevada.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together will constitute one and the same agreement.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Parties have duly executed this Assignment and Assumption Agreement on the date first above written.

**By Buyer:**

New Day Broadband LLC


_____

By: Neal Schnog
Its: Manager

**By Seller:**

BROADSTRIPE, LLC
BROADSTRIPE CAPITAL, LLC


_____

By:
Its: