### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | **Chapter 11** |
|  | ) |  |
| **BROADSTRIPE, LLC, ET AL.,** | ) | **Case No. 09-10006 (CSS)** |
|  | ) |  |
| Debtors. | ) | **Jointly Administered** |
|  | ) |  |
|  | ) | Hearing Date: Sept. 14, 2011 at 3:00 p.m. |
|  | ) | Objection Deadline: Sept. 7, 2011 at 4:00 p.m. |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS UNDER A FIRST AMENDED PLAN, (B) APPROVING THE FORM AND MANNER OF NOTICES THEREOF, (C) APPROVING CERTAIN BID PROTECTIONS, (D) APPROVING PURCHASE AND SALE AGREEMENTS, AND (E) GRANTING CERTAIN RELATED RELIEF**

Broadstripe, LLC ("Broadstripe," "Company" or "Borrower") and certain of its direct and indirect affiliates, the debtors and debtors in possession in the above-captioned cases (the "Debtors")[1], by and through their undersigned counsel, respectfully file this motion (the "Motion") for entry of an order (the "Bidding Procedures Order") in substantially the form attached as Exhibit A hereto (a) establishing bidding procedures in substantially the form attached as Exhibit B hereto ("Bidding Procedures") relating to the sale of substantially all of the Debtors' assets and assignment of certain executory contracts (the "Sale") under a first amended plan, (b) approving the form and manner of notices thereof, (c) approving certain bid protections (the "Bid Protections"), (d) approving Purchase and Sale Agreements, and (e) granting certain related relief. The Motion is filed pursuant to Section 105 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). In support of the Motion, the Debtors state as

---

[1] The Debtors in these cases are Broadstripe Capital, LLC ("Capital"); Broadstripe, LLC, MDM Systems Northwest, L.L.C., Summit Cablevision, L.P., CP NW1, L.L.C., and CP NW2, L.L.C. This motion is not applicable to Capital's case.

{00547470;v1}

follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.  Early Case Background**

2.     On January 2, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.     Since the Petition Date, the Debtors have managed their affairs and conducted their businesses as debtors-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' Chapter 11 cases.

4.     On January 15, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

5.     Now headquartered in Dallas, Texas, the Debtors own and operate cable television and related telecommunications properties in three regions: Maryland (the "Mid-Atlantic System"), Michigan (the "Central System"), and in Washington and Oregon (the "Northwest System" and together with the Mid-Atlantic System and the Central System, the "Systems"). As of the Petition Date, the Debtors provided approximately 93,000 customers analog and digital cable video services, high-speed data internet access services, and telephone services through their broadband network of coaxial and fiber optic cable.  The Systems and related executory contracts are the

Debtors' principal assets.

6.      The Debtors in these cases are an intermediate holding Company, Capital, and the operating companies which are all of the other debtors.  Broadstripe acquired all of the other debtors at or shortly after the formation.  Nearly all of the assets are held in Broadstripe, but there are a few legacy contracts or franchises, and possibly some vehicles, held in the names of the lower-tier subsidiaries.  The corporate organization of the Debtors is displayed on the chart below:



7.      The operating Debtors (i.e., Broadstripe and its subsidiaries) have two tranches of secured financing.  The senior debt arose under that certain Second Amended and Restated First Lien Credit Agreement dated as of July 28, 2006 (as amended, supplemented or otherwise modified and together with all supporting documents, the "First Lien Facility") by and among Millennium Digital Media Systems, LLC, n/k/a Broadstripe, LLC, as borrower, The Bank of New York as administrative agent and the lenders party thereto from time to time (collectively, the "First Lien Lenders"), the Debtors are indebted to their First Lien Lenders in the approximate prepetition amount of $180 million.  The majority of the debt under the First Lien Facility is held by funds

3

managed by Highland Capital Management, L.P. ("Highland").

8.      The junior or second lien debt arose pursuant to that certain Second Lien Credit Agreement dated as of July 28, 2006 (as amended, supplemented or otherwise modified and together with all supporting documents, the "Second Lien Facility") by and among Millennium Digital Media Systems, LLC, n/k/a Broadstripe, LLC, as borrower, NexBank, SSB as administrative agent and the lenders party thereto from time to time (collectively, the "Second Lien Lenders"), the Debtors are indebted to their Second Lien Lenders in the approximate prepetition amount of $102 million.  The majority of the debt under the Second Lien Facility is held by funds managed by Highland.

9.      Capital's indebtedness consists of obligations owed under those certain Increasing Rate Notes ("IRN's") in the original principal amount of $70 million.  At issuance, the IRN's bore interest at the greater of 12.125% or LIBOR+7.25% per annum. Thereafter, the interest rate increased periodically up to the greater of 16.375% or LIBOR+10.75%.   Interest could be paid in cash or in kind at Capital's election. Additionally, certain penalty fees (as defined in the Increasing Rate Note Purchase Agreement) accrued upon the failure of Capital to redeem the Increasing Rate Notes within contemplated time frames.   As a result, the balance of the IRN's as of the petition date was $373,533,498.84.  Concurrently with the execution of the First Lien and Second Lien Facilities, the Increasing Rate Notes' maturity was extended to December 31, 2012.  Capital is liable on the First Lien Debt and Second Lien Debt as a guarantor.  Capital's sole asset is the single member LLC interest in Broadstripe, and accordingly has no direct interest in the assets to be sold.

10.     Since the beginning of these cases, the Debtors have had cash needs for

heavy maintenance and capital expenditures in excess of available cash proceeds from operations.  Currently, the Debtors have post-petition financing pursuant to that certain Senior Secured, Superpriority Debtor-in-Possession Credit Agreement dated as of July 9, 2009 (as amended, the "DIP Credit Agreement") by and among Broadstripe, as borrower, and The Bank of New York Mellon as administrative agent and the lenders party thereto from time to time (collectively, the "DIP Lenders").  The DIP Lenders are all Highland managed funds. Broadstripe is presently indebted to the DIP Lenders in the approximate amount of $11.3 million.

### B.  The Committee Action, Other Significant Claims and the Stipulation

11.    The Committee is chaired by James Cable, LLC ("James Cable") and includes WaveDivision Holdings, LLC (and together with its affiliate Michigan Broadband, LLC, "Wave") as an *ex officio* member.  At the beginning of the case, and in connection with the *Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Senior Secured Super-Priority Financing Pursuant to 11 U.S.C. §§ 105, 362, 363(c)(2), 364(c), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral of Pre-Petition Lenders, (II) Granting Adequate Protection to Pre-Petition Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 47], the Committee was granted a period of time within which it could examine and challenge the debt, liens or security interests of the first and second lien lenders (the "Challenge Period").

12.    The Challenge Period was extended and the Committee filed suit against Highland and certain institutional and retail funds managed by Highland.  The suit requested, among other things, equitable subordination of the Highland funds' claims and liens, recharacterization of loans as equity contributions, recoveries based on theories of

5

breach of fiduciary duties, interference with contract, fraud, and avoidance of alleged preferential transfers and fraudulent conveyances (the "Committee Action").

13.     The Highland funds contested the Committee Action, received a partial summary judgment dismissing one of the counts and were preparing to try the case. Conversely, the Committee's main counts survived the summary judgment and the Committee was preparing to try the case.

14.     Additionally, the Debtors were in litigation arising from the pre-petition purchase and sale agreements referred to above.  The proposed buyer, Wave, filed suit against Broadstripe prepetition alleging breach of contract arising from an agreement by Broadstripe to sell two of its operating systems to Wave in 2006.  Broadstripe removed the case to this court.  Wave filed a motion to remand the case to Chancery Court, which was granted.  The case (the "Chancery Court Action") was tried earlier last year, and Wave received an Order of Judgment (the "Judgment") against Broadstripe in the amount of $14,872,000, plus pre- and post-judgment interest.  Previously, Wave filed four (4) proofs of claim against Broadstripe, LLC and three of its subsidiaries, each in the amount of $101,864,000, claim nos. 256-259 (the "Wave Claims").

15.     The proposed pre-petition seller to the Debtors was James Cable, which had filed two (2) proofs of claim against Broadstripe, each in the amount of "at least $56,650,775.92" (the "James Cable Claims"). James Cable had a pre-petition suit against Broadstripe and Highland in the Chancery Court of Delaware with respect to the same subject matter that gave rise to the James Cable Claims. Highland was dismissed from that lawsuit, and James Cable did not appeal the ruling. The remainder of the lawsuit, which related solely to James Cable's claims against Broadstripe, was removed by

Broadstripe to the Bankruptcy Court as Adversary Proceeding No. 09-00114 (the "James Cable Adversary"), and was consolidated with Broadstripe's objection to the James Cable Claims.

16.     On January 15, 2009, two weeks after the Petition Date, the Debtors filed a plan of reorganization which provided that unsecured creditors would receive approximately 5% equity interests in the reorganized Debtors.  However, those interests were subject to dilution if a transfer of secured debt was later converted to equity.  The reorganization effort stalled for many months due to the pendency of the litigation.  The Creditors Committee and its constituents would not agree to any plan that would allow the Highland claims in full and treat those claims as secured.  The Highland lenders would not agree to any plan which accorded them less than the treatment provided for pursuant to the various credit agreements.

17.     On September 28, 2010, a mediation was held in Dallas, Texas (the "Mediation"), to resolve the Committee Action, the Chancery Court Action, the Wave Claims, the James Cable Claims, the James Cable Adversary, and Broadstripe's exit from Chapter 11.

18.     At the Mediation the Parties were able to reach agreement on a framework for resolving the host of issues among them.  The Parties negotiated that certain Stipulation of Settlement (the "Stipulation"), and submitted it to the Court for approval in a motion to compromise controversy (the "Compromise Motion"; Docket No. 1656).

19.     Hearings were held on the Compromise Motion on December 13 and December 28, 2010.  The Court entered an order granting the Compromise Motion on December 28, 2010 [Docket No. 1730].

20.     Among other things, the Stipulation provided for the funding of a creditors

7

trust upon either a sale of assets or effectiveness of a plan of reorganization and for certain payment of Committee counsel fees by year end 2010.  The Stipulation also provided that the secured lenders would be free to credit bid their debt in either a sale of assets or through a plan, and provided for the allowance of the secured lenders' claims.  While the Debtors had already been testing the market to see if a sale of substantially all the assets of the companies would yield a better return than an internal reorganization, the Stipulation opened the way to successfully conclude any sale that was acceptable to the stakeholders.

### C. The Marketing Effort and the Proposed Sale

21.    Early in these Chapter 11 cases, the Debtors retained DH Capital, LLC ("DH Capital"), as their investment banker to assess and report on the valuation of the Debtors' business enterprise in connection with the Debtors' efforts to obtain post-petition financing.  [Docket Nos. 469 and 604].  Subsequently, the scope of DH Capital's retention was enlarged to market and sell several of the Debtors' smaller cable systems.  [Docket Nos. 720 and 793].  In April 2010, Broadstripe sought an additional expansion of the scope of DH Capital's employment to seek exit financing for a plan of reorganization and to explore the sale of substantially all of the Debtors' assets and the assignment of critical executory contracts.

22.    DH Capital prepared a non-disclosure agreement and an introductory memorandum or "teaser."  DH Capital then contacted approximately 70 potential interested parties including regional and national cable television companies, private equity groups and management teams and had detailed conversations with 41 groups.  Non-Disclosure agreements were negotiated and agreed to with 22 different parties.

23.    DH Capital, working with the Company then created a detailed informational memorandum which was distributed to the 22 interested parties. The Company operates in three distinct geographical regions, the Northwest, Central and Mid-Atlantic (collectively, the "Regions") and the Memorandum was prepared to facilitate bidders interested in any combination or all of the Regions. DH Capital called for first round bids in early August 2010. Buyers were asked to provide certain information with regard to financial capacity to fund a transaction as well as which of the Company's three Region's of operations upon which they were interested in bidding.  A First Round Bid Summary dated August 9, 2010 was prepared and distributed to the Company's management committee.

24.    The Company received six bids; two bids for the entire Company and one bid for the Mid-Atlantic Region, two bids for the Central Region and one bid for the Northwest Region. All bids were subject to further due diligence, but were conforming to bid requests.  The process then moved into a detailed due diligence phase.  Broadstripe established an electronic virtual data room to which first round bidders had access as well as onsite access to the Systems.  Two tours were conducted in the Northwest Region, three in the Central Region and one in the Mid-Atlantic Region.  Final bids were due at the end of October 2010.  DH Capital received five such bids.  Two of the final bids were for the entire company and three were for the Mid-Atlantic Region.

25.    The Company, in consultation with DH Capital, agreed to proceed with a bid for substantially all the assets of the Company from a consortium of WideOpenWest Mid-Michigan, LLC, WaveDivision I, LLC, and Anne Arundel Broadband, LLC (collectively, the "Proposed Purchasers").

26.    Broadstripe believes that a sale of substantially all of the assets to the Proposed

9

Purchasers will yield a higher value than piecemeal sales would bring.  There are multiple support services that are shared among the three Systems.  The customer call center, physically located in Michigan, serves all regions.  Similarly, the central billing system is connected to all three regions, and because billing includes such services as telephone services and video on demand, it is an interactive system and not simply a centralized production of invoices.  Most complicated is the VOIP connection system which routes calls from each of the 3 separate Systems through centralized lines.

27.    Of all the offers initially received by the Debtors, the highest and best offer was the joint bid of the Proposed Purchasers.  The initial joint bid of the Proposed Purchasers as set forth in their letter of intent was rejected by the Debtors.  However, after subsequent negotiations with the Debtors, the Proposed Purchasers revised their joint offer to $95 million.

28.    Although the Proposed Purchasers' joint $95 million offer amounts to just over half of the amount of the prepetition secured debt owed to the Debtors' First Lien Lenders and DIP Lenders, after satisfaction of the DIP Facility and payment of other administrative expense claims, the majority of the First Lien Lenders and the DIP Lenders have provided conditional consent to the sale of substantially all of the Debtors' assets to the Proposed Purchasers, subject to higher and better offers.

29.    After extensive arm's length negotiations, the Debtors and the Proposed Purchasers have agreed upon the form of the Purchase and Sale Agreements (the "Purchase and Sale Agreements").  A substantially similar form of Purchase and Sale Agreement shall be used for the Northwest Region and the Central Region.  A true and correct copy of the Purchase and Sale Agreements for those regions are attached hereto as Exhibit C.  The

Purchase and Sale Agreement for the Mid-Atlantic Region differs primarily with respect to assets and liabilities being acquired by the Proposed Purchasers and with respect to certain purchase price adjustments.  A true and correct copy of the Purchase and Sale Agreement for the Mid-Atlantic Region is attached hereto as Exhibit D.

  30. The Debtors do not seek authority to sell their assets to Proposed Purchasers in this Motion.  The Debtors intend to transfer their assets and assign designated contracts to the Proposed Purchasers or other Prevailing Bidder (as defined below) pursuant to a first modified plan ("Plan") that will be filed at a later date in accordance with the terms of the Purchase and Sale Agreements.

## RELIEF REQUESTED

  31. By this Motion, the Debtors seek entry of an order: (i) approving the proposed Bid Procedures; (ii) approving the proposed Bid Protections; (iii) approving the procedures for assumption and assignment of executory contracts and leases; (iv) approving the form and manner of notices of the Bid Procedures and assumption and assignment procedures; (v) approving the Purchase and Sale Agreements; and (vi) granting related relief.

## THE BIDDING PROCEDURES

  32. The proposed Bidding Procedures are designed to maximize value for the Debtors' estate, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Purchase and Sale Agreements. The Bidding Procedures describe, among other things, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any auction (the "Auction"), and the selection and approval of any ultimately successful bidder(s) (the "Bidding Process").

33.     In accordance with the proposed Bidding Procedures, the Debtors' request that the Auction for the Systems occur on Thursday, October 20, 2011.

34.     The Debtors believe that the Plan which will provide for a going concern transfer of the Systems is essential to maximize asset value and creditor recoveries. The Debtors further believe that the proposed timeline affords the Debtors a sufficient opportunity to pursue a Bidding Process that will maximize creditor recoveries.

35.     A copy of the proposed Bidding Procedures is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.   A summary of the key terms of the Bidding Procedures follows:[2]

a.      <u>Confidentiality</u>.  If they have not already done so, the Debtors shall obtain an executed confidentiality agreement from any prospective bidder desiring to become a Qualified Bidder.[3]

b.      <u>Notice to Prospective Bidders</u>.  The Debtors shall provide notice of the Auction, Sale, and Confirmation Hearing (as defined below) by first class mail, postage prepaid, to: (a) all potential purchasers previously identified or solicited by the Debtors and any additional parties who have at any time previously expressed an interest in potentially acquiring the Systems, (b) all other potentially interested parties identified by the Debtors or their advisors; (c) the Office of the United States Trustee, (d) all parties of interest who have requested notice pursuant to Bankruptcy Rule 2002, (e) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any or all of the Systems, (f) all counterparties to executory contracts; (g) all applicable federal, state and local regulatory, franchising or taxing authorities or recording offices which have a reasonably known interest in the relief requested in the Motion; and (h) all other parties on the Debtors' most current master service list filed in the Debtor's bankruptcy cases.

c.      <u>Qualified Bidders</u>.  To be identified by the Debtors by **Wednesday October 19, 2011**.  Persons seeking to become a Qualified Bidder must comply with the requirements set forth in the Bidding Procedures, including provision of an Escrow Deposit.

---

[2] The following is a summary of the key terms of the Bidding Procedures.  To the extent the Bidding Procedures included in Exhibit B and this summary disagree, the terms of the Bidding Procedures shall control.
[3] Capitalized terms utilized but not defined in this summary of the Bidding Procedures shall have the meaning ascribed to them in the Bidding Procedures.

d.    <u>Due Diligence</u>.  Investigations and due diligence to be completed by **Tuesday, October 18, 2011**.

e.    <u>Scope of Auction</u>.  All bids at the Auction must be for cash and/or readily marketable securities and on terms consistent with or better than the Purchase and Sale Agreements.

f.    <u>Auction</u>.  Scheduled for, and Prevailing Bidder(s) to be selected on, **Thursday, October 20, 2011 at 10:00 a.m. prevailing Central Time** at the law offices of Gardere Wynne Sewell LLP, 1000 Louisiana, Suite 3400, Houston, Texas 77002.  The Auction shall be conducted in accordance with the procedures set forth in the Bidding Procedures.

g.    <u>Prevailing Bidder</u>.  After reviewing bids made at the Auction on the bases described in the Bidding Procedures, the Debtors, with the consent of the DIP Lenders and First Lien Lenders, shall identify the highest or otherwise best bid(s) and the Prevailing Bidder(s) who submitted such bid(s).

h.    <u>Back-up Bidder</u>.  A condition of the participation in the Auction will be that the Qualified Bidder(s) submitting the second highest Prevailing Bid(s) shall be declared the Back-up Bidder(s), and must agree to acquire the particular System or Systems at the Back-up Bidder's(s') highest Auction bid price if the Prevailing Bidder(s) fail(s) to close.

i.    <u>Plan Confirmation</u>.  Approval of the sale to the Prevailing Bidder(s) will be considered by the Court at the Plan Confirmation Hearing.  At the Plan Confirmation Hearing, the Debtors will adduce evidence and seek, among other things, Court approval of the Prevailing Bid(s) by the Prevailing Bidder(s) and authority to enter into and consummate a definitive purchase and sale agreement with such bidder(s).  The Debtors' authority to accept any Prevailing Bid(s) and enter into a binding agreement with the Prevailing Bidder(s) is subject in all respects to Court approval and authorization.

j.    <u>Failure to Consummate Prevailing Bid</u>.  If for any reason the Prevailing Bidder(s) fail(s) to timely consummate the transaction(s) contemplated by the Prevailing Bid(s) and the Confirmation Order, the Debtors may declare the Back-Up Bidder(s) as having submitted the highest or otherwise best bid(s) and seek to consummate the Back-Up Bid(s) upon further approval by the Court.

k.    <u>Treatment of Deposits</u>.  Escrow Deposits shall be returned or forfeited in accordance with the terms of the Bidding Procedures.

## NOTICE OF PROPOSED TRANSACTIONS, BID PROCEDURES, AND AUCTION

36.    In order to provide interested parties notice of the proposed transactions, the Auction and related Bid Procedures, within five (5) business days following the entry of an Order approving this Motion, or as soon thereafter as is practicable, the Debtors will serve a notice of the proposed transactions, the Auction, and Bidding Procedures (the "Sale Notice"), a form of which is attached hereto as Exhibit E, by first class mail, postage prepaid, to: (a) all potential purchasers previously identified or solicited by the Debtors and any additional parties who have previously expressed an interest in acquiring the Debtors' assets since the Petition Date, (b) all other potentially interested parties identified by the Debtors or their advisors; (c) the Office of the United States Trustee, (d) counsel for the DIP Lenders, First Lien Lenders, and Second Lien Lenders, (e) counsel for the Proposed Purchasers, (f) counsel for the Committee, (g) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Systems, (h) all applicable federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested in the Motion, and (i) all other parties who have requested notice in these cases.

37.    In addition, within five (5) business days of entry of an Order approving this Motion or as soon thereafter as reasonably practicable, the Debtors will publish notice of the Sale (the "Sale Publication") once each in the national edition of the Wall Street Journal and at least one prominent cable industry publication.  A form of the Sale Publication is attached hereto as Exhibit F.

38.    The Sale Notice and Sale Publication satisfy the notice requirements of Bankruptcy Rules 2002 and 6004, and constitute good and sufficient notice; accordingly, no other or further notice should be required.  The Debtors request that the form and manner of

service of the Sale Notice and Sale Publication be approved in all respects.

## THE BID PROTECTIONS

39.    To compensate the Proposed Purchasers for serving as a stalking horse for the Sale of the Debtors' Systems, whose bid will be subject to higher and/or otherwise better offers, the Debtors seek authority to provide certain Bid Protections to the Proposed Purchasers under the Purchase Agreements in the event they are not the Prevailing Bidder for the Systems. The Debtors have agreed to provide the Proposed Purchasers a break-up fee equal to 2% of their proposed purchase price for the Systems, i.e., $1.9 million (the "Break-Up Fee") and expense reimbursement of up to $1,000,000.  The Debtors and Proposed Purchasers also negotiated a minimum overbid amount of $3.4 million (the "Minimum Overbid Requirement").  Accordingly, the initial overbid, if any, must be at least $98.4 million.

40.    The Debtors submit that given the magnitude of this transaction, the Minimum Overbid Requirement of is reasonable and appropriate. Thereafter, each successive bid by each Qualified Bidder must be in minimum overbid increments of not less than $250,000 of the pending highest bid.  The Debtors reserve the right to conduct the Auction in any manner that they anticipate will result in the highest or otherwise best value for their estates that is not inconsistent with any order of this Court, provided that any changed or additional rules for the Auction are communicated to all participants at the Auction.

41.    The proposed Bid Protections encourage the Proposed Purchasers to invest the requisite time, money, and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of substantially all of the Debtors' assets, despite the inherent risks and uncertainties of the Chapter 11 process. The Break-Up Fee is a material inducement for, and condition of, the Proposed Purchasers' entry into the Purchase

Agreements.  The Debtors believe (i) that the Bid Protections are reasonable, given the benefit to their estates of having definitive Purchase and Sale Agreements and the risk to the Proposed Purchasers that an alternative purchaser's offer ultimately may be accepted, (ii) that the Bid Protections are necessary to preserve and enhance the value of the Debtors' estates, and (iii) if the Break-Up Fee is triggered, the Proposed Purchasers' efforts will have increased the chances that the Debtors will receive the highest or otherwise best offer for the Systems, to the benefit of the Debtors' estates.  In sum, the Debtors' ability to offer the Bid Protections and the Break-Up Fee enables them to ensure the sale of the Systems to a contractually-committed bidder at a price they believe to be fair while, at the same time, providing them with the potential of obtaining even greater benefit for their estates. Accordingly, the Bid Protections and the Break-Up Fee are appropriate and should be approved.

### PROCEDURES FOR DETERMINING CURE AMOUNTS AND ADEQUATE ASSURANCE FOR COUNTERPARTIES TO ASSIGNED CONTRACTS

42.    The Debtors and debtors in possession are party to numerous executory contracts and/or unexpired leases for, among other things, pole attachment privileges, municipal franchises, billing services, telephony services, internet and broadband support services, etc., that are necessary, and in many instances critical, in the operation of their Systems.  Many such contracts are to be assumed and assigned to the Proposed Purchasers or other Prevailing Bidder(s) in connection with the Sale of the Systems.  Accordingly, the Debtors request appoval of the form and manner of notice to be provided to affected executory contract counterparties and establishment of procedures for such parties to object to any aspect of such assumption and assignment.

43.    The proposed procedures are as follows:

a.      By **Thursday, September 15, 2011**, the Debtors shall send a notice to each

counterparty to an executory contract or unexpired lease (each, a "Contract Counterparty") setting forth the Debtors' calculation of the cure amount (which for the avoidance of doubt shall include any amounts required to be paid under sections 365(b)(1)(A) or 365(b)(1)(B) of the Bankruptcy Code or any postpetition amounts that have accrued or accrue (or relate to a period) prior to the time of consummation of the proposed transactions) (each, a "Cure Amount"), if any, that would be owing to such Contract Counterparty if the Debtors decided to assume or assume and assign such executory contract or unexpired lease (each a "Cure Notice," substantially in the form of Exhibit G attached hereto).  Any Contract Counterparty that objects to the amount set forth in the Cure Notice must file an objection (a "Cure Objection") and serve the Cure Objection on the Notice Parties (as defined below) so that it is actually received on or before **5:00 p.m. prevailing Eastern Time on Tuesday, October 4, 2011**, which Cure Objection must be served on counsel for the Debtors, Gardere Wynne Sewell LLP, 1000 Louisiana, Suite 3400, Houston, Texas, 77002, (Attn.:  John P. Melko) and Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 (Attn: Don A. Beskrone); counsel to the Stalking Horse Bidders, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn.: Joshua Sussberg and Arun Kurichety); counsel to the First Lien Lenders, Ropes & Gray LLP, One International Place, Boston, MA 02110-2624 (Attn: Alyson B.G. Allen) and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, DE 19899 (Attn: David B. Stratton); the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn: David Buchbinder); and counsel to the Official Committee of Unsecured Creditors, Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, NY 10019 (Attn: David M. Friedman) and Potter Anderson Corroon LLP, 1313 N. Market Street, P.O. Box 951, Wilmington, DE 19899-0951 (Attn: Etta Wolfe) (collectively, the "Notice Parties").  If a Contract Counterparty does not timely file and serve a Cure Objection that party will be forever barred from objecting to the Debtors' proposed Cure Amount.  To the extent a Contract Counterparty files a timely Cure Objection asserting a higher amount than the Cure Amount listed in the Cure Notice and the parties are unable to consensually resolve the dispute, the Cure Amount, if any, with respect to such objection will be determined at a hearing to be requested by the Debtors or by the objecting Contract Counterparty, which hearing must occur no later than the Confirmation Hearing.

b.    In the event the Stalking Horse Bidders are not the Prevailing Bidders at the Auction, on **Friday, October 21, 2011**, the Debtors will send notice to each Contract Counterparty of the identity of the Prevailing Bidder(s) and notice of the Debtors' intent to assume and assign the Contract Counterparty's executory contract or lease (the "Contract Assignment Notice").  Any Contract Counterparty that wishes to obtain information regarding the ability of the Prevailing Bidder(s) (other than the Stalking Horse Bidders) to perform under the executory contract or unexpired lease must notify counsel for the Debtors in writing at Gardere Wynne Sewell LLP, 1000 Louisiana, Suite 3400, Houston, Texas, 77002, Attn.:  John P. Melko, or at jmelko@gardere.com, on or before **Wednesday, October 26, 2011**

17

(the "Request for Adequate Assurance").  The Request for Adequate Assurance must include an email and/or physical address to which a response to such information request can be sent.

c.    If a Contract Counterparty timely submits a Request for Adequate Assurance, the Debtors shall serve such party with any non-confidential information relating to adequate assurance of the Prevailing Bidder(s) (other than the Stalking Horse Bidders) received by the Debtors as provided in the Bidding Procedures by email and/or overnight delivery on or before **Thursday, October 27, 2011**.  If a Contract Counterparty that timely submits a Request for Adequate Assurance objects to the adequacy of the assurance provided, it must file any objection (a "Contract Assignment Objection") to adequate assurance of future performance by the Prevailing Bidder(s) (other than the Stalking Horse Bidders) and serve the Contract Assignment Objection on the Notice Parties so that it is actually received on or before **5:00 p.m. prevailing Eastern Time on Friday, November 11, 2011**.  If the Stalking Horse Bidders are not the Prevailing Bidders and if a Contract Counterparty does not timely submit a Request for Adequate Assurance and does not timely and properly file and serve a Contract Assignment Objection, such Contract Counterparty shall be forever barred from objecting to, or requesting adequate assurance of, the Prevailing Bidder's(s') ability to perform and/or take an assignment of the applicable contract or lease from the Debtors.

44.    The Debtors submit that the foregoing procedures will help facilitate the resolution of any disputes over Cure Amounts and/or objections to assumption and assignment of executory contracts and leases to the Proposed Purchasers or any other Prevailing Bidder(s), while adequately protecting the rights of Contract Counterparties, and therefore request approval of these procedures.

## CONFIRMATION HEARING

45.    In connection with submission of their Plan the Debtors will seek a hearing (the "Confirmation Hearing") at which the Debtors will seek confirmation of their Plan, which will propose the transfer of substantially all of their assets and assumption and assignment of certain of the executory contracts and unexpired leases to the Stalking Horse Bidders or other Prevailing Bidder(s).  The Debtors request that the Confirmation Hearing be held on **Monday, November 14, 2011**, or as soon thereafter as the Court's schedule permits.

# APPLICABLE AUTHORITY

## A. The Bidding Procedures and Bid Protections

46.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that the proposed Bidding Procedures are most likely to maximize the realizable value of the Systems for the benefit of the Debtors' estate, creditors, and other parties-in-interest. Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

47.     The approval of break-up fees and other forms of bidding protections in connection with the sale of assets has become an established practice in Chapter 11 cases. Bankruptcy courts have approved bidding incentives similar to the Bid Protections requested by the Debtors under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest business judgment. Similar procedures have been previously approved by other bankruptcy courts. Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of sound business judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Integrated Res.*, 147 B.R. 650, 657-58 (Bankr. S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993) (establishing three (3) basic factors for determining whether to permit such fees in bankruptcy: "(1) is the relationship of parties who negotiated break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper,

19

rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price?"); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) (holding that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Section 503(b) govern in the bankruptcy context and, accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate).

48.    In this case, the assets were extensively marketed.  Nonetheless, the Debtors still want to give one final opportunity to any prospective purchaser willing to pay a higher price for the assets on terms at least as favorable as those in the Purchase and Sale Agreements.  The Buyers will only agree to this if they receive something in return.  The amount of the Break-Up Fee and Minimum Overbid Requirement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Proposed Purchasers. The Break-Up Fee, equal to two percent (2%) of the Purchase Price, is fair and reasonable in amount, particularly in view of the efforts that will have to be expended by the Proposed Purchasers as the stalking horse bidders (the "Stalking Horse Bidders").

49.    In sum, the Debtors' ability to offer the Break-Up Fee and other Bid Protections enables them to ensure the sale of the Systems to the Proposed Purchasers at a price they believe to be fair while, at the same time, providing the Debtors with the potential of even greater benefit to the estate.

50.    The Debtors request that the Court authorize the Bid Protections, including but not limited to payment of the Break-Up Fee and expense reimbursement and imposition of the Minimum Overbid Requirement as set forth herein, pursuant to the terms and conditions of the

Purchase and Sale Agreements and the Bidding Procedures.

**B. Contract and Lease Assumption and Assignment Procedures**

51.     Section 365(a) of the Bankruptcy Code provides that, subject to court approval, a debtor in possession may assume or reject any of its executory contracts or unexpired leases. 11 U.S.C. § 365(a).  This section is intended to provide a means whereby a debtor can force the specific performance of the counterparty to an executory contract or unexpired lease if the debtor cures all defaults in its past performance and provides adequate assurance of future performance.  *Lifemark Hospitals, Inc. v. Liljeberg Enterprises, Inc. (In re Liljeberg Enters., Inc.)*, 304 F.3d 410, 438 (5th Cir. 2002).   "The act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services."  *In re Nat'l Gypsum Co.,* 208 F.3d 498, 505 (5th Cir. 2000).

52.     The traditional standard applied to determine whether the assumption or rejection of an executory contract or unexpired lease should be authorized is the "business judgment" standard, and courts traditionally grant significant deference to the exercise of reasonable business judgment by a debtor in possession. *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *NLRB v. Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional"); *In re III Enterprises, Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted) ("Generally, a court will give great deference to a debtor's decision to assume or reject the contract.  A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

53.     The business-judgment standard mandates that, unless the decision is the product

21

of bad faith, whim, or caprice, a court must approve a debtor in possession's decision to assume an executory contract or unexpired lease. *See, e.g., Bildisco*, 465 U.S. at 523; *In re Prime Motor Inns*, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991) (opining that a court must follow the business judgment of the debtor unless that judgment is the product of bad faith, whim, or caprice).

54.     Section 365(b)(1) of the Bankruptcy Code provides that, if a default in an executory contract or unexpired lease exists, the debtor in possession may not assume that contract or lease unless, at the time of assumption, the trustee (a) cures, or provides adequate assurance that the trustee will promptly cure, the default; (b) compensates, or provides adequate assurance that the trustee will promptly compensate the party for any actual pecuniary loss resulting from the default; and (c) provides adequate assurance of future performance under the contract. 11 U.S.C. § 365(b)(1).

55.     The trustee or debtor in possession may elect to assign an executory contract once it has been assumed. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's asets).

56.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract … only if the trustee assumes such contract … and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" rests on the facts and circumstances of each case, but the phrase should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R.

436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance does not mean absolute assurance). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property to be assigned; *accord In re Bygaph, Inc.*, 56 B.R 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee has sufficient financial resources and is willing to devote sufficient funding to business in order to insure strong likelihood of success; chief derterminant of adequate assurance is whether contractual obligations will be met).

57.     Although the Debtors do not seek, by this Motion, authority to assume, assign, or reject executory contracts or leases, the Debtors submit that their decision to do so in connection with the transfer of their assets to the Prospective Purchasers or other Prevailing Bidder(s) under a Plan is a prudent exercise of their reasonable business judgment and the related procedures for assuming and assigning contracts proposed herein are a necessary step in the process towards ultimate assumption and assignement or rejection of those agreements.

58.     From the Debtors' perspective, such executory contracts and unexpired leases are a critical part of their overall business operation, and their ability to assume and assign their rights to participate in such agreements is critical compenent of the consideration to be provided to the Proposed Purchasers or Prevailing Bidder(s) in connection with the transfer of their Systems.  Indeed there is little doubt that if the Debtors were unable to assume and assign such contracts and leases, the Proposed Purchasers or any other Prevailing Bidder would have little, if any, interest in purchasing the Debtors' Systems.  As such, the Debtors' decision to establish procedures for the assumption and assignment of such contracts and leases is a sound exercise of their business judgment and should be approved in all respects.

59.     The Debtors' proposed procedures are designed to efficiently resolve any

23

disputes over cure payment or other objections to assumption and assignment and are fair and reasonable. Furthermore, similar procedures have been approved by bankruptcy courts in other chapter 11 cases, including the bankrutpcy case of a multiple systems operator like Broadstripe. *See*, *e.g.*, *In re Adelphia Communications Corp., et al.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. October 14, 2005); *In re Verestar., et al.*, Case No. 03-18077 (ALG) (Bankr. S.D.N.Y. April 23, 2004); *In re Petrie Retial, Inc.*, *et al.*, Case No. 95 B 44528 (AJG) (Bankr. S.D.N.Y. July 6, 1998). The Court has authority to implement the procedures under the auspices of section 105(a) of the Bankruptcy Code which empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Since the proposed procedures complement and further, rather than abrogate and avoid, the purposes and provisions of section 365, and since the procedures will enable the Debtors to effectuate the transfer of their Systems and hasten the successful conclusion of these Chapter 11 cases, the procedures should be approved in all respects.

### C. Sale Notice and Sale Publication

60.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction. *See* FED. R. BANKR. P. 6004(f)(l). Further, pursuant to Bankruptcy Rule 2002(a)(2), this Court may, for cause shown, shorten or direct another method of giving notice for the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. *See* FED. R. BANKR. P. 2002(a)(2). Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. *See* FED. R. BANKR. P. 2002(c)(1). Moreover, the notice of a proposed use, sale,

or lease of property is sufficient if it generally describes the property. *Id.*

61.     The Debtors request that the form and manner of service of Sale Notice and the form and manner of publication of the Sale Publication be approved in all respects.

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of an order (i) approving the proposed Bid Procedures; (ii) approving the proposed Bid Protections; (iii) approving the procedures for establishing cure amounts and adequate assurance of future performance for Debtors' assumption and assignment of executory contracts and leases; (iv) approving the form and manner of service and/or publication of the (a) Sale Notice, (b) Publication Notice, and (c) Cure Notice; (v) approving the Purchase and Sale Agreements; and (vi) granting any other relief this Court deems just and proper.

Dated: August 18, 2011

ASHBY & GEDDES, P.A.

*/s/ Don A. Beskrone*

Don A. Beskrone (#4380)
Amanda M. Winfree (#4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067

- and -

GARDERE WYNNE SEWELL, LLP
John P. Melko (TX 13919600)
Clinton R. Snow (TX 24060629)
1000 Louisiana, Suite 3400
Houston, TX  77002
Telephone:  (713) 276-5500
Facsimile:  (713) 276-5555

COUNSEL FOR THE DEBTORS

25