**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | **)** | **Chapter 11** |
| | **)** | |
| **Broadstripe, LLC,** *et al.*, | **)** | **Case No. 09-10006 (CSS)** |
| | **)** | |
| **Debtors.** | **)** | **Jointly Administered** |


**DEBTORS' FIRST MODIFIED PLAN OF REORGANIZATION**


September 13, 2011

GARDERE WYNNE SEWELL, LLP
John P. Melko (TX 13919600)
Amy Dinn (TX 24026801)
Clinton R. Snow (TX 24060629)
1000 Louisiana, Suite 3400
Houston, TX  77002
Telephone:  (713) 276-5500
Facsimile:  (713) 276-5555

ASHBY & GEDDES, P.A.
Don A. Beskrone (#4380)
Amanda M. Winfree (#4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067


COUNSEL FOR THE DEBTORS

TABLE OF CONTENTS

*ARTICLE I INTRODUCTION* ............................................................................................ *1*
    1.1    Introduction. ................................................................................................................ 1
    1.2    Classification of Claims and Interests. ....................................................................... 2
*ARTICLE II DEFINITIONS* ................................................................................................ *2*
    2.1    Definitions**.**................................................................................................................... 2
    2.2    Interpretation, Rules of Construction, Computation of Time, and Choice of Law. ................ 15
*ARTICLE III TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS* ....................... *16*
    3.1    Treatment of Allowed Administrative Expenses. ....................................................... 16
    3.2    Treatment of Allowed DIP Claims............................................................................. 18
*ARTICLE IV SUBSTANTIVE CONSOLIDATION* ........................................................ *18*
    4.1    Substantive Consolidation. ........................................................................................ 18
    4.2    Request for Substantive Consolidation. ..................................................................... 19
    4.3    Intercompany Claims and Interests Among Debtors................................................... 19
    4.4    Claims Between Debtors and Capital.......................................................................... 19
    4.5    Tabulation of Votes..................................................................................................... 19
    4.6    Reservation of Rights. ................................................................................................ 20
*ARTICLE V TREATMENT OF CLASSES OF CLAIMS AND INTERESTS* ............... *20*
    5.1    Treatment of Allowed Class 1 Claims (Priority Non-Tax Claims). ........................... 20
    5.2    Treatment of Allowed Class 2 Claims (First Lien Note Claims). .............................. 21
    5.3    Treatment of Allowed Class 3 Claims (Non-Highland Second Lien Note Claims)............... 21
    5.4    Treatment of Allowed Class 4 Claims (Miscellaneous Secured Claims)................................ 22
    5.5    Treatment of Allowed Class 5 Claims (General Unsecured Claims). ........................ 22
    5.6    Treatment of Allowed Class 6 Claims (Highland Second Lien Note Claims). ...................... 22
    5.7    Treatment of Allowed Class 7 Interests. .................................................................... 23
*ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN INCLUDING TREATMENT*
            *OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES*        *23*
    6.1    Sale of Assets and Assignment of Executory Contracts............................................. 23
    6.2    General Company Matters........................................................................................... 29
    6.3    Corporate Governance................................................................................................ 29
    6.4    Effectiveness of Securities, Instruments and Agreements.......................................... 30
    6.5    Approval of Agreements. ............................................................................................ 30
    6.6    Employee Benefit Plans. ............................................................................................ 30
    6.7    Closing under the Purchase and Sale Agreement. ...................................................... 30
    6.8    Payment of Management Incentive Bonuses and Severance. ..................................... 32
    6.9    Distribution of Cash. .................................................................................................. 33
    6.10  Distribution of Equity Securities................................................................................ 33
    6.11  Implementation of Stipulation of Settlement, Including Third Party Releases...................... 34
    6.12  Cancellation and Surrender of Existing Debt Instruments, Interests and other
           Securities. ................................................................................................................... 35
    6.13  Release of Liens and Perfection of Liens. .................................................................. 35
    6.14  Restructuring Transactions.......................................................................................... 35
*ARTICLE VII DISPUTED CLAIMS, DISPUTED INTERESTS, AND MISCELLANEOUS*
            *DISTRIBUTION PROVISIONS*                 *36*
    7.1    Objections................................................................................................................... 36
    7.2    Amendments to Claims; Claims Filed After the Confirmation Date. ......................... 36
    7.3    Reserves and Estimations. .......................................................................................... 36
    7.4    Undeliverable or Unclaimed Distributions................................................................. 37
    7.5    Transmittal of Distributions and Notices. .................................................................. 37

| | | |
|---|---|---|
| 7.6 | Withholding Taxes. | 38 |
| 7.7 | Retention of Rights to Pursue Causes of Action. | 38 |

*ARTICLE VIII DISCHARGE, RELEASES AND INDEMNIFICATION*      *38*

| | | |
|---|---|---|
| 8.1 | **Discharge**. | 38 |
| 8.2 | **Releases**. | 39 |
| 8.3 | Indemnification. | 41 |
| 8.4 | Creditors' Committee Termination. | 41 |

*ARTICLE IX CONDITIONS TO OCCURRENCE OF THE EFFECTIVE DATE*      *41*

| | | |
|---|---|---|
| 9.1 | Conditions to Occurrence of the Effective Date. | 41 |
| 9.2 | Waiver of Conditions to Occurrence of the Effective Date. | 42 |

*ARTICLE X EFFECTS OF PLAN CONFIRMATION*      *42*

| | | |
|---|---|---|
| 10.1 | Binding Effect. | 42 |
| 10.2 | Reorganized Debtor. | 43 |
| 10.3 | Vesting of Property. | 43 |
| 10.4 | **Injunction**. | 43 |

*ARTICLE XI ADMINISTRATIVE PROVISIONS*      *44*

| | | |
|---|---|---|
| 11.1 | Retention of Jurisdiction. | 44 |
| 11.2 | Cram Down. | 46 |
| 11.3 | Modification of the Plan. | 46 |
| 11.4 | Set-offs. | 46 |
| 11.5 | Compromise of Controversies. | 47 |
| 11.6 | Acceptance by Secretary of State. | 47 |
| 11.7 | Withdrawal or Revocation of the Plan. | 47 |
| 11.8 | Successors and Assigns. | 47 |
| 11.9 | Governing Law. | 47 |
| 11.10 | Notices. | 47 |
| 11.11 | No Admissions. | 48 |
| 11.12 | **Exculpation**. | 48 |

# ARTICLE I
# INTRODUCTION

1.1    *Introduction.*

(a)    This First Modified Plan of Reorganization (the "<u>Plan</u>") is proposed by and on behalf of each Debtor as its individual, separate plan under Chapter 11 of the Bankruptcy Code.  Reference is made to the First Modified Disclosure Statement (the "Disclosure Statement") accompanying the Plan for a discussion of the Debtors' history, results of operations, historical financial information and properties, and for a summary and analysis of the Plan.  All holders of Claims against or Interests in a Debtor are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.  Capitalized terms used but not defined herein have the meanings assigned to them in Section 2.1 of the Plan.  Unless otherwise stated herein, section ("§") references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532.

(b)    The Plan provides that substantially all of the assets of the Debtors will be sold and certain of the Debtors' contracts will be assigned to one or more Buyers, pursuant to one or more Purchase and Sale Agreements approved by the Bankruptcy Court.[1]  The sale(s) will close after the Confirmation Order becomes final and conditions under each of the Purchase and Sale Agreements are satisfied.  As soon as reasonably practical after the Effective Date, the Creditors' Trust will be funded for the benefit of the general unsecured creditors, pursuant to the Bankruptcy Court's order which approved the Stipulation of Settlement among the Creditors' Committee, various Highland related entities, the Debtors and certain other significant creditors of the estates.  Additionally, the DIP Loan will be repaid, Allowed Administrative Expense and priority claims, including U.S. Trustee's fees, will be paid, certain ongoing costs of administration may be escrowed or reserved, and the Net Distributable Cash will be distributed to the First Lien Lenders, along with the equity interests in the Reorganized Debtor.

(c)    The lower tier subsidiaries of Broadstripe, namely Summit, NW1, NW2 and MDM, will be substantively consolidated into Broadstripe, which will continue in existence as the Reorganized Debtor for a relatively short period of time to provide transition services to the Buyers and to wrap up any claims objections not assigned to the Creditors' Trust.  The Chapter 11 bankruptcy case of Capital shall be converted to Chapter 7 on the Effective Date or as soon as practicable thereafter.

(d)    After its obligations under the Transition Services Agreements are satisfied, the Reorganized Debtor will be dissolved and its equity interests cancelled.  Upon dissolution, the Reorganized Debtor will assign all of its rights under the Purchase and Sale Agreements and Ancillary Agreements and all other residual property and property rights of the Reorganized Debtor to a trust for the benefit of holders of First Lien Note Claims (the "<u>First Lien Note Claim Trust</u>"), which trust shall be deemed to be the successor in interest to the

---

[1]    In the event of any inconsistency between the terms of the Plan and the Purchase and Sale Agreements, the terms of the applicable Purchase and Sale Agreement shall control, including, without limitation, section 7.14 thereof.  Notwithstanding the foregoing, in the event of any inconsistency between the Plan and the Stipulation of Settlement, the Stipulation of Settlement controls.

Reorganized Debtor for purposes of enforcing any and all such rights. The trust agreement for the First Lien Note Claim Trust (the "First Lien Note Claim Trust Agreement") will be filed as a Plan Supplement. The First Lien Note Claim Trust will be administered in accordance with the First Lien Note Claim Trust Agreement.

(e)    In the event that the Bankruptcy Court substantively consolidates some but not all of the Debtors, the Debtors reserve the right to proceed with Confirmation without substantive consolidation or with partial substantive consolidation as allowed by the Bankruptcy Court. In the event that the Bankruptcy Court does not substantively consolidate any of the Debtors' Estates, the Plan shall be deemed to comprise an individual separate plan of reorganization for each Debtor, and the Confirmation requirements of § 1129 must be satisfied separately as to each Debtor. The Debtors reserve the right to seek Confirmation of the Plan for fewer than all of the Debtors.

1.2    *Classification of Claims and Interests.*

Pursuant to § 1122, the following Classes of Claims and Interests are designated for each Debtor under the Plan.

Class 1 consists of all Priority Non-Tax Claims.

Class 2 consists of all First Lien Note Claims.

Class 3 consists of all Non-Highland Second Lien Note Claims.

Class 4 consists of all Miscellaneous Secured Claims.

Class 5 consists of all General Unsecured Claims.

Class 6 consists of Highland Second Lien Note Claims.

Class 7 consists of all Interests.

Administrative Expenses, DIP Claims and Priority Tax Claims of the kinds specified in §§ 507(a)(1), 502(i) and 507(a)(8) have not been classified and are excluded from the foregoing Classes in accordance with § 1123(a)(1).

## ARTICLE II
## DEFINITIONS

The following terms used herein shall have the respective meanings defined below:

2.1    *Definitions.*

***Administrative Expense*** means any (a) cost or expense of administration of the Chapter 11 Case (including, without limitation, the fees and expenses of Professionals) asserted or arising under §§ 503(b) or 507(b), (b) Claim determined to be an Administrative Expense pursuant to a Final Order, (c) fee or charge assessed against the Estate under 28 U.S.C. § 1930.

Solely for purposes of Distribution and payment pursuant to the terms of the Plan, and not for any other purpose (including for purpose of allowance (*See* § 3.1(c)), the Lender Expense Claims and Cure Amounts shall be deemed to be Administrative Expenses.

*Administrative Expense Bar Date* shall have the meaning set forth in Section 3.1(e).

*Allowed* means with respect to Claims and Interests, (a) any Claim against, or Interest in, a Debtor, proof of which is timely Filed or by order of the Bankruptcy Court is not or will not be required to be Filed, (b) any Claim or Interest that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no timely Filed proof of Claim has been Filed, (c) any Interest registered in the member interest register maintained by or on behalf of any Debtor as of the Distribution Record Date or (d) any Claim allowed pursuant to this Plan and, in each such case in (a), (b) and (c) above, as to which either (i) no objection to the allowance thereof has been Filed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (ii) such an objection is so Filed and the Claim or Interest shall have been allowed pursuant to a Final Order (but only to the extent so allowed).

*Amended Operating Agreement* means the operating agreement of the Reorganized Debtor to become effective on the Effective Date in form and substance satisfactory to the Required First Lien Lenders.

*Ancillary Agreements* means the agreements that are ancillary to the Purchase and Sale Agreements but collectively constitute a critical component of the sale transaction with the Buyers and includes the Escrow Agreements, Transition Services Agreements, Retained Franchise Management Agreements, and the Bill of Sale, Assignment and Assumption Agreements.

*Assumed Contracts* means those executory contracts and unexpired leases to be assumed and assigned to the Buyers, which are listed on Schedule 2.1(a)(ii) of each of the Purchase and Sale Agreements, which schedules, as may be amended or supplemented from time to time in accordance with the terms of the Purchase and Sale Agreements, shall be included in the Plan Supplement to be filed with the Bankruptcy Court.

*Avoidance Actions* shall have the meaning ascribed to it in the Stipulation of Settlement.

*Ballot Deadline* means the date set by the Bankruptcy Court as the last date on which Ballots may be submitted.

*Ballots* means the form of ballot that accompanies the Plan and the Disclosure Statement upon which holders of Impaired Claims entitled to vote on the Plan may indicate their acceptance or rejection of the Plan.

*Bank of America* means Bank of America, N.A.

*Bankruptcy Code* means Title 11, United States Code, as amended from time to time, in the form applicable to this Chapter 11 Case.

***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Case or such other court of competent jurisdiction as may obtain such jurisdiction in the future.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as amended from time to time, in the form applicable to this Chapter 11 Case, and any local rules of the Bankruptcy Court.

***Bar Date*** means (i) as to Creditors other than Governmental Units, 4:00 p.m. prevailing Eastern Time on March 23, 2009, which is the final date for Filing proofs of Claim or proofs of Interest in the Chapter 11 Case; (ii) as to Governmental Units, 4:00 p.m. prevailing Eastern Time on July 1, 2009, which is the final date for Filing proofs of Claim or proofs of Interest herein; and (iii) as to any Rejection Claim, thirty (30) days after the earlier of (a) the entry of an order authorizing rejection of a contract or lease or (b) the Confirmation Date.

***Barrier*** means Barrier Advisors, L.P.

***Bidding Procedures Order*** means that certain order entered by the Bankruptcy Court approving the procedures governing the auction, sale, and assignment and assumption of the Assumed Contracts.

***BoNY*** means The Bank of New York Mellon.

***Broadstripe*** means Broadstripe, LLC (fka Millennium Digital Media Systems, L.L.C.), a Delaware limited liability company. Broadstripe is the sole member and manager of MDM, NW1 and NW2, and is the 99% general partner of Summit. Because one of the Buyers is acquiring the Debtors' rights in the name "Broadstripe," the Reorganized Debtor will change its name after the Effective Date.

***Business Day*** means any day other than a Saturday, Sunday or legal holiday.

***Buyers*** means, collectively, WideOpenWest Mid-Michigan, LLC, WaveDivision I, LLC, and Anne Arundel Broadband, LLC or any other entity or entities selected by the Debtors, with the consent of the Required First Lien Lenders, as the prevailing bidder(s) for substantially all of the Debtors' assets at a Bankruptcy Court-approved auction.

***Capital*** means Broadstripe Capital, LLC (fka Millennium Digital Media Capital, LLC), a Delaware limited liability company. Capital, as the sole member of Broadstripe, owns all of the Interests in Broadstripe. Pursuant to an order for joint administration, Capital's bankruptcy case (Case No. 09-10008) has been jointly administered under the bankruptcy case of Broadstripe, LLC (Case No. 09-10006).

***Cash*** means United States currency, a certified check, a cashier's check or a wire transfer of immediately available funds from any source or a check drawn on a domestic bank.

***Cause of Action*** means any action, cause of action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, right to payment, and Claim, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or indirectly or derivatively, in law, equity or otherwise.

*Chapter 7* means chapter 7 of the Bankruptcy Code.

*Chapter 11* means chapter 11 of the Bankruptcy Code.

*Chapter 11 Case* means the jointly administered Chapter 11 cases of the Debtors and Capital pending in the Bankruptcy Court as Case No. 09-10006 (CSS).

*Chapter 5 Cause of Action* means any Cause of Action arising under §§ 510, 544 through 551 and 553 or otherwise arising under chapter 5 of the Bankruptcy Code.

*Claim* means any right to (a) payment from any Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown, or (b) an equitable remedy for breach of performance if such breach gives rise to a right of payment from any Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, known or unknown.

*Class* means any group of substantially similar Claims or Interests classified by the Plan pursuant to § 1122.

*Collateral* means any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code.

*Confirmation* means the entry of the Confirmation Order on the docket maintained by the Clerk of the Bankruptcy Court with respect to the Chapter 11 Case.

*Confirmation Date* means the date on which the Confirmation Order is entered on the docket maintained by the Clerk of the Bankruptcy Court with respect to the Chapter 11 Case.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court regarding Confirmation of the Plan pursuant to § 1129, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to § 1129.

*Consolidation Transaction* means a dissolution or winding up of the corporate existence of a Debtor under applicable state law or the consolidation, merger, contribution of assets or other transaction in which a Debtor merges with or transfers substantially all of its assets and liabilities to another Debtor.

*Creditor* means any Entity that is the holder of a Claim that arose on or before the Petition Date or a Claim of the kind specified in §§ 502(g), 502(h) or 502(i).

*Creditors' Committee* means the Official Committee of Unsecured Creditors in the Chapter 11 Case, as appointed by the Office of the United States Trustee and reconstituted from time to time, which members are identified in the Disclosure Statement.

*Creditors' Trust* means that certain liquidating trust formed under the laws of the State of Delaware and created pursuant to the Stipulation of Settlement as approved by the Bankruptcy Court. The Creditors' Trust shall be established as contemplated by, and within the meaning of, Treas. Reg. § 301.7701-4(d), and upon qualification, shall be taxed as a "grantor trust" under and in accordance with the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code") and applicable Treasury Regulations.

*Creditors' Trust Agreement* means the agreement among the Debtors, the Creditors' Committee and the trustee designated by the Creditors Committee establishing the Creditors' Trust.

*Cure Amount* means, with respect to any executory contract or unexpired lease, the amount, if any, that must be paid in connection with the assumption of such contract or lease to satisfy the requirements of § 365(b)(1)(A). All Cure Amounts shall be determined in accordance with the procedures included in the Bidding Procedures Order.

*Debtors* means, collectively, Broadstripe, MDM, Summit, NW1 and NW2.

*Debtor in Possession* means any Debtor in its capacity as a debtor in possession in the Chapter 11 Case under §§ 1101, 1107 and 1108.

*Deficiency Claim* means with respect to a Claim that is partially secured by Collateral, the amount by which the Allowed amount of such Claim exceeds the value of the Collateral.

*DIP Agent* means The Bank of New York Mellon, as agent under the DIP Facility, and its successors.

*DIP Claims* means all Claims payable under the DIP Facility, including without limitation all fees and expenses payable to the DIP Lenders, DIP Agent, First Lien Lenders, First Lien Agent, Second Lien Lenders, and Second Lien Agent and their retained legal and other professionals as contemplated by the DIP Order.

*DIP Credit Agreement* means the Senior Secured Super Priority Debtor-in-Possession Credit Agreement, dated July 9, 2009, by and among Broadstripe, LLC, as borrower, the other Debtors, as guarantors, the Bank of New York Mellon, as agent, and the DIP Lenders party thereto, and all ancillary agreements and instruments thereto (as amended from time to time).

*DIP Facility* means the postpetition loans and other financial accommodations provided pursuant to the DIP Credit Agreement.

**DIP Lenders** means the lenders party to the DIP Facility and defined therein as "Lenders," and their respective successors, participants and assigns.

**DIP Order** means the *Order (i) Authorizing Debtors (a) to Obtain Post-Petition Senior Secured Superpriority Financing and (b) to Use Cash Collateral of Pre-Petition Lenders, and (ii) Granting Adequate Protection to Pre-Petition Lenders* entered on the Bankruptcy Court's docket on June 30, 2009 (Docket No. 658) (as amended from time to time).

**DLLCA** means the Delaware Limited Liability Company Act.

**Disallowed** means, when used with respect to a Claim or an Interest, a Claim or an Interest that has been disallowed pursuant to a Final Order.

**Disclosure Statement** means the *Disclosure Statement in Support of Debtors' First Modified Chapter 11 Plan of Reorganization*, including all exhibits, schedules, amendments, supplements and modifications thereto.

**Disputed Claim** means all or a portion of a Claim that is not an Allowed Claim as to which:  (a) a proof of Claim has been Filed, or deemed Filed under applicable law or order of the Bankruptcy Court; (b) an objection has been or may be timely Filed; and (c) such objection has not been: (i) withdrawn, (ii) overruled or denied in whole or in part pursuant to a Final Order, or (iii) granted in whole or part pursuant to a Final Order.  Before the time that an objection has been or may be Filed, a Claim shall be considered a Disputed Claim (A) in its entirety, if any corresponding Claim scheduled by the Debtors has been scheduled as disputed, contingent or unliquidated in its Schedules and the claimant did not file a proof of claim on or before the Bar Date; or (B) in its entirety, if no corresponding Claim has been scheduled by the Debtors in their Schedules and the claimant did not file a proof of claim on or before the Bar Date.

**Distribution** means any distribution to be made pursuant to the Plan.

**Distribution Record Date** means 5:00 p.m. on the Business Day immediately preceding the Confirmation Date or such other time and date designated in the Confirmation Order.

**Effective Date** means a Business Day selected by the Debtors after which all conditions to the occurrence of the Effective Date set forth in Section 9.1 have been satisfied or duly waived.  The Effective Date will occur simultaneously with the closing of each of the Purchase and Sale Agreements.

**Entity** means any individual, corporation, limited or general partnership, joint venture, association, joint stock company, limited liability company, estate, entity, trust, trustee, United States Trustee, unincorporated organization, government, Governmental Unit, agency or political subdivision thereof.

**Escrow Agreements** means the Escrow Agreements dated as of August 16, 2011 by and among the Sellers' Representative, Escrow Agent (each as defined in the Escrow Agreements) and each of WideOpenWest Mid-Michigan, LLC, WaveDivision I, LLC, and Anne Arundel Broadband, LLC or any other entity or entities selected by the Debtors, with the consent of the

Required First Lien Lenders, as the prevailing bidder(s) for substantially all of the Debtors' assets at a Bankruptcy Court-approved auction.

*Estate* means the estate of a Debtor created pursuant to § 541 upon the Petition Date.

*Excluded Assets* shall have the meaning set forth in Section 6.1(e).

*Exculpated Persons* shall have the meaning set forth in Section 11.12.

*Face Amount* means: (a) with respect to a particular Claim, (i) if the Claim is listed in the Schedules and the holder of such Claim has not timely Filed a proof of Claim, the amount of such Claim that is listed in the Schedules as not disputed, contingent or unliquidated; or (ii) if the holder of such Claim has timely Filed a proof of Claim, the liquidated amount stated in such proof of Claim, or such amount as is determined by the Final Order of the Bankruptcy Court; (b) in the case of an Administrative Expense, the liquidated amount set forth in any application Filed with respect thereto, or the amount set forth in the Debtors' books and records or such amount as is determined pursuant to a Final Order; or (c) in all other cases, zero or such amount as shall be fixed or estimated pursuant to a Final Order.

*Fee Auditor* shall have the meaning set forth in Section 3.1(e)(iii).

*File, Filed or Filing* means file, filed or filing with the Clerk of the Bankruptcy Court in the Chapter 11 Case.

*Final Order* means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case, which has not been reversed, amended, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari,* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order, shall not cause such order not to be a Final Order.

*First Lien Agent* means The Bank of New York Mellon, as agent under the First Lien Credit Agreement, and its successors.

*First Lien Credit Agreement* means that certain Second Amended and Restated First Lien Credit Agreement, dated as of July 28, 2006 among Millennium Digital Media Systems, L.L.C., as borrower, The Bank of New York Mellon, as administrative agent, and the lenders party thereto (including all amendments and modifications thereto).

*First Lien Lenders* means the lenders party to the First Lien Credit Agreement (together with their successors or assigns), by original execution or assignment thereof.

***First Lien Note Claim*** means any Claim of the First Lien Lenders for the repayment of outstanding and unpaid principal and interest due and owing pursuant to the First Lien Credit Agreement, including accrued and unpaid interest thereon accruing after the Petition Date at the non default rate applicable under the First Lien Credit Agreement, but specifically excluding any fees and expenses constituting a part of the Lender Expense Claim.

***First Lien Note Claim Trust*** shall have the meaning set forth in Section 1.1(d).

***First Lien Note Claim Trust Agreement*** shall have the meaning set forth in Section 1.1(d).  The First Lien Note Claim Trust Agreement shall provide that the First Lien Note Claim Trust shall remain in place until at least the time at which all funds held in escrow pursuant to any of the Escrow Agreements have been released from escrow in accordance with the terms of the relevant Escrow Agreement.

***Fleet*** means Fleet National Bank.

***General Unsecured Claim*** means any Claim against a Debtor that (i) is not a Secured Claim; (ii) is not entitled to priority under §§ 503 or 507 and (iii) is not an Administrative Expense, a DIP Claim, Priority Tax Claim, Priority Non-Tax Claim, First Lien Note Claim, a Second Lien Note Claim, a Miscellaneous Secured Claim, a Non-Highland Second Lien Note Claim or a Subordinated Claim.

***Governmental Unit*** means a governmental unit as such term is defined in § 101(27).

***Highland*** means, collectively, Highland Capital Management, L.P.; Loan Funding IV LLC; Highland Loan Funding V Ltd.; Highland Crusader Offshore Partners, LP.; Southfork CLO, Ltd.; Atascosa Investments, LLC; Milam High Yield Fund; Hopkins Capital Partners; Gillespie Income Fund; Burnet Partners, LLC; Loan Funding VII LLC; Highland Credit Opportunities CDO Ltd.; Liberty CLO, Ltd.; Presidio Capital Management; Gleneagles CLO Ltd.; Jasper CLO, Ltd.; Navarro Investment Partners LLC; Brentwood CLO, Ltd.; Eastland CLO, Ltd.; Grayson CLO Ltd.; Greenbriar CLO, Ltd.; Highland Credit Strategies Master Fund; Red River CLO, Ltd.; Stratford CLO Ltd.; Highland Credit Strategies Fund; Highland Floating Rate Advantage Fund; and Highland Floating Rate Fund.

***Highland Crusader*** means Highland Crusader Offshore Partners, LP.

***Highland Second Lien Note Claims*** means those Second Lien Note Claims held by Highland on the Petition Date.

***Highland Wave Defendants*** shall have the meaning ascribed to it in the Stipulation of Settlement.

***Impaired*** means with respect to any Claim or Interest, impaired within the meaning of § 1124.

***Intercompany Claim*** means a Claim held by any Debtor or Capital against any other Debtor or Capital based on any fact, action, omission, occurrence or transaction that occurred or came into existence prior to or after the Petition Date, including without limitation, any

Administrative Expense or other account receivable, account payable, contribution claim, or Chapter 5 Cause of Action asserted by one Debtor or Capital against another Debtor or Capital.

*Interests* means the equity interests in the Debtors, including, without limitation, member interests of the Debtors and any rights, options, warrants, calls, subscriptions or other similar rights or agreements, commitments or outstanding securities obligating the Debtors to issue, transfer or sell any member interests of the Debtors.

*James* means James Cable, LLC.

*Lender Expense Claim* means all fees and expenses of First Lien Lenders, Second Lien Lenders, the First Lien Agent and Second Lien Agent that the Debtors are obligated to reimburse pursuant to the DIP Order.

*Lenders* means, collectively, the DIP Lenders, the First Lien Lenders and the Second Lien Lenders.

*LIBOR* means the London InterBank Offered Rate for United States dollar deposits for one month which appears on the Dow Jones Telerate Screen page 3750 (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major bonds), at 11:00 a.m. London time, on the relevant date.

*Lien* means any security interest, charge against, encumbrance upon or other interest in property, the purpose of which is to secure payment of a debt or performance of an obligation.

*MDM* means MDM Systems Northwest, L.L.C., a Delaware limited liability company. MDM is the 1% limited partner of Summit.

*Miscellaneous Secured Claim* means a Secured Claim that is not a secured Priority Tax Claim, Priority Non-Tax Claim, Administrative Expense, Lender Expense Claim, DIP Claim, First Lien Note Claim or Second Lien Note Claim.

*Net Distributable Cash* means the proceeds of sale, after the payments contemplated by the Plan to be made on or immediately following the Effective Date, including without limitation payment of the Settlement Sum, Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, Miscellaneous Secured Claims, Wind-Down Expenses and the reserve of funds for disputing claims under the Escrow Agreements, in each case as reflected in the Wind-Down Budget; provided, that as funds become available under the Wind-Down Budget as a result, *inter alia*, of the disallowance of Administrative Expenses or priority Claims, or the completion of the wind down of the Reorganized Debtors, such funds shall become additional Net Distributable Cash.

*New Board of Managers* means the board of managers of the Reorganized Debtor, as of the Effective Date.

*New Members Interests* means the authorized new membership interests of the Reorganized Debtor, which will be issued by the Reorganized Debtor on the Effective Date pursuant to the terms of the Plan.

**NexBank** means NexBank, SSB.

**Non-Highland Second Lien Note Claims** means those Second Lien Note Claims held on the Petition Date by entities other than Highland.

**NW1** means CP NW1, L.L.C., a Washington limited liability company.

**NW2** means CP NW2, L.L.C., a Washington limited liability company.

**Petition Date** means January 2, 2009, the date on which the Debtors commenced the Chapter 11 Case.

**PIK** means "payment in kind."

**Plan** means this *Debtors' First Modified Chapter 11 Plan of Reorganization*, dated as of September 9, 2011, including, without limitation, the annexes, exhibits and schedules hereto, as the same may be amended or modified from time to time in accordance with the Confirmation Order, the provisions of the Bankruptcy Code and the terms hereof.

**Plan Documents** means the agreements, documents and instruments entered into before, on or as of the Effective Date as contemplated by, and in furtherance of, the Plan in form and substance acceptable to the Required First Lien Lenders.  Copies of Plan Documents shall be available to counsel for the Creditors' Committee and, upon request to counsel for the Debtors, to Creditors; *provided*, *however*, that no Plan Documents that have been filed under seal in accordance with an order of the Bankruptcy Court shall be made available to Creditors without the express written consent of the Required First Lien Lenders, the Buyers and the Debtors or Reorganized Debtor (as applicable), or an order of the Bankruptcy Court.

**Plan Rate** means the "underpayment rate" (as defined in Section 6621(a)(2) of the Tax Code) on the Business Day immediately preceding the Confirmation Date, which rate is the rate of interest charged by the Internal Revenue Service on delinquent federal income taxes.

**Plan Supplement** means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed at least ten (10) calendar days before the Confirmation Hearing, and any additional documents or schedules Filed before the Effective Date as supplements or amendments to the Plan Supplement, including the following: (a) Amended Operating Agreement; (b) Escrow Agreements; (c) list of Assumed Contracts; (d) New Board of Managers; (e) New Member Interests and the (f) Creditors' Trust Agreement. Any reference to Plan Supplement in this Plan shall include each of the documents identified in above as (a) through (e).  The Debtors, with the consent of the Required First Lien Lenders, shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

**Priority Non-Tax Claim** means any Claim entitled to priority in payment under § 507(a), other than an Administrative Expense or a Priority Tax Claim.

**Priority Tax Claim** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in §§ 502(i) and 507(a)(8), including any Secured Claim which

would otherwise meet the description of an unsecured Claim of a Governmental Unit under § 507(a)(8) but for the secured status of that Claim.

*Professional* means any Entity: (a) employed pursuant to an order of the Bankruptcy Court in accordance with §§ 327 or 1103 providing for compensation for services rendered prior to the Effective Date pursuant to §§ 327, 328, 329, 330 and 331, or (b) seeking compensation and reimbursement pursuant to §§ 503(b)(2) or (4).

*Purchase and Sale Agreements* means, collectively, the Purchase and Sale Agreements dated as of August 16, 2011 by and among the Debtors and WideOpenWest Mid-Michigan, LLC, WaveDivision I, LLC, and Anne Arundel Broadband, LLC, respectively, or the Purchase and Sale Agreement(s) dated as of a date on or before the Effective Date with any other entity or entities selected by the Debtors, with the consent of the Required First Lien Lenders, as the prevailing bidder(s) for substantially all of the Debtors' assets at a Bankruptcy Court-approved auction.

*Ratable Proportion* means, with reference to any Distribution on account of an Allowed Claim in a given Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Claim bears to the aggregate amount of all Allowed Claims in such Class.

*Rejected Contracts* means, pursuant to § 365(a), those executory contracts and unexpired leases (i) previously rejected by the Debtors or (ii) deemed rejected effective as of the Confirmation Date or such other date as may be agreed to by the parties to the executory contract or unexpired lease or ordered by the Bankruptcy Court.

*Rejection Claim* means any Claim arising from the rejection of a Rejected Contract, including any Claim of (a) a lessor for damages resulting from the rejection of a lease of real property as any such Claim shall be calculated in accordance with § 502(b)(6) or (b) an employee for damages resulting from the rejection of an employment agreement as any such Claim shall be calculated in accordance with § 502(b)(7).  A Rejection Claim shall constitute a General Unsecured Claim.

*Release Effective Date* means the date the Creditors' Trust is funded with the Settlement Sum per the terms of the Stipulation of Settlement.

*Released Parties* means the beneficiaries of the various releases granted pursuant to Section 8.2 of the Plan, each being a "Released Party".

*Reorganized Debtor* means Broadstripe, from and after the Effective Date.

*Required DIP Lenders* means those DIP Lenders holding in excess of 50% of the sum of (i) outstanding loans and (ii) unfunded commitments to loan, in each case, under the DIP Facility.

*Required First Lien Lenders* means those First Lien Lenders holding in excess of 50% of the First Lien Note Claims.

***Retained Franchise Management Agreements*** means, collectively, the Retained Franchise Management Agreements dated as of the Effective Date by and among the Debtors and WideOpenWest Mid-Michigan, LLC and WaveDivision I, LLC, respectively, or any other entity or entities selected by the Debtors, with the consent of the Required First Lien Lenders, as the prevailing bidder(s) for substantially all of the Debtors' assets at a Bankruptcy Court-approved auction.

***Schedules*** means the *Schedules of Assets and Liabilities* Filed by the Debtors under § 521 and Bankruptcy Rule 1007 in the Chapter 11 Case, as amended from time to time.

***Second Lien Agent*** means NexBank, SSB, as agent under the Second Lien Credit Agreement, and its successors.

***Second Lien Credit Agreement*** means that certain Second Lien Credit Agreement, dated as of July 28, 2006 among Millennium Digital Media Systems, L.L.C., as borrower, NexBank, SSB, as administrative agent, and the lenders party thereto (including all amendments and modifications thereto).

***Second Lien Lenders*** means the lenders party to the Second Lien Credit Agreement (together with their successors, participants or assigns), by original execution or assignment thereof.

***Second Lien Note Claim*** means any Claim of the Second Lien Lenders for the repayment of outstanding and unpaid principal and interest due and owing pursuant to the Second Lien Credit Agreement, but specifically excluding any fees and expenses constituting a part of the Lender Expense Claim.

***Secured Claim*** means a Claim secured by a Lien on Collateral to the extent of the value of such Lien (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and the Debtors or (c) as determined pursuant to a Final Order in accordance with § 506(a) or, in the event that such Claim is subject to setoff under § 553, to the extent of such setoff.

***Sellers*** means, collectively, Broadstripe, Summit, NW1 and NW2.

***Sellers' Representative*** shall have the meaning provided in the Escrow Agreements.

***Settlement Sum*** means the amount with which the Creditors' Trust shall be funded pursuant to the Stipulation of Settlement, i.e., $3,300,000.00.

***Statement of Financial Affairs*** means the *Statement of Financial Affairs* Filed by the Debtors under § 521 and Bankruptcy Rule 1007 in the Chapter 11 Case, as amended from time to time.

***Stipulation of Settlement*** means that certain agreement approved with revisions pursuant to the Order Granting Debtors' Motion For An Order Pursuant To Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Compromise Among The Debtors, Committee, Committee Counsel, Highland, James Cable, And WaveDivision, and (B) Approving the Related Stipulation of Settlement, entered on the docket on or about December 29, 2010.

Page 13

**Subordinated Claim** means any Claim which by its terms or by Final Order of the Bankruptcy Court is subordinated to the payment of General Unsecured Claims, including any Claim which is subordinated to the payment of another Claim pursuant to any applicable provision of the Bankruptcy Code (including § 510 thereof) or applicable non-bankruptcy law.

**Superior Court Action** means the litigation captioned WaveDivision Holdings, LLC and Michigan Broadband, LLC v. Highland Capital Management, L.P., et al., Civil Action No. 08C-11-132-JOH pending in the Superior Court of Delaware.

**Summit** means Summit Cablevision L.P., a Washington limited partnership.

**Transferred Assets** shall have the meaning set forth in Section 6.1(e).

**Transition Services Agreements** means each of the Transition Services Agreements dated as of the Effective Date by and among the Debtors and WideOpenWest Mid-Michigan, LLC, WaveDivision I, LLC, and Anne Arundel Broadband, LLC, respectively, or any other entity or entities selected by the Debtors, with the consent of the Required First Lien Lenders, as the prevailing bidder(s) for substantially all of the Debtors' assets at a Bankruptcy Court-approved auction.

**Trustee** shall have the meaning ascribed to it in the Stipulation of Settlement.

**Unimpaired** means a Claim or Interest that is not Impaired.

**Wave** means WaveDivision Holdings, LLC, together with its affiliate Michigan Broadband, LLC.

**Wave Superior Court Complaint** means the complaint filed by Wave in the Superior Court Action, as amended by the First Amended Complaint, dated as of May 28, 2009, and as further amended by the Second Amended Complaint, dated as of August 28, 2009.

**Wind-Down Budget** shall have the meaning set forth in Section 6.1(d) and shall be in form and substance satisfactory to the Required First Lien Lenders.

**Wind-Down Expenses** shall mean amounts estimated in the Wind-Down Budget to be necessary to fund the conversion of Capital to Chapter 7, to fund the activities of the Reorganized Debtor under the Transition Services Agreement (after giving effect to the Buyers' obligations to reimburse the Reorganized Debtors for such activities), to fund the operations of the Reorganized Debtor during the post Effective Date period and to fund the wind-down and dissolution of the Reorganized Debtor following the completion of the period provided under the Transition Services Agreement.

**Worker's Compensation Programs** means those statutorily mandated programs in effect on the Petition Date providing compensation, paid for by third parties, to employees of the Debtors for job-related injuries or job-related illnesses, which are required to be maintained under provisions of non-bankruptcy law.

2.2    *Interpretation, Rules of Construction, Computation of Time, and Choice of Law.*

(a)    The provisions of the Plan shall control over any descriptions thereof contained in the Disclosure Statement.

(b)    Any term used in the Plan that is not defined in the Plan, either in this Article II or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules.  Without limiting the foregoing, the rules of construction set forth in § 102 shall apply to the Plan, unless superseded herein.

(c)    Unless specified otherwise in a particular reference, all references in the Plan to Articles, Sections and Exhibits are references to Articles, Sections and Exhibits of or to the Plan.

(d)    Any reference in the Plan to a contract, document, instrument, release, bylaw, certificate, indenture or other agreement being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.

(e)    Any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date without limitation to the provisions set forth in Article VII of this Plan.

(f)    Captions and headings to Articles and Sections in the Plan are inserted for convenience of reference only and shall neither constitute a part of the Plan nor in any way affect the interpretation of any provisions hereof.

(g)    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(h)    All exhibits, annexes and schedules to the Plan are incorporated into the Plan, and shall be deemed to be included in the Plan, regardless of when Filed.

(i)    Subject to the provisions of any contract, certificate, bylaws, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

(j)    Where applicable, references to the singular shall include the plural, and *vice versa.*

# ARTICLE III
## TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS

3.1 *Treatment of Allowed Administrative Expenses.*

(a) <u>General</u>.  Subject to the deadlines set forth herein, each holder of an Allowed Administrative Expense against a Debtor shall receive Cash equal to the unpaid portion of such Allowed Administrative Expense on or as soon as reasonably practicable after the later of: (i) the Effective Date; and (ii) the date on which such Administrative Expense becomes Allowed; *provided*, *however*, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business  consistent with past practices of the Debtors shall be paid in full or performed by the Reorganized Debtor or the applicable Buyer, as the case may be, in accordance with existing terms and conditions, in the ordinary course of business consistent with such past practices provided that such Administrative Expenses are invoiced to the Reorganized Debtor or applicable Buyer, as applicable, not more than sixty (60) days after the Effective Date; *provided further*, that, except for holders of Administrative Expenses governed by Section 3.1(e)(ii) of the Plan, holders of Administrative Expenses arising under sections 503(b)(3) or 503(b)(4) of the Bankruptcy Code, must file a written request for allowance and payment of such Administrative Expense in accordance with section 503 of the Bankruptcy Code on or before the twentieth (20th) day after Debtors' service of notice of the Effective Date or be forever barred from asserting such Administrative Expenses against the Debtors, the Reorganized Debtor or any of their property; and *provided further*, a Governmental Unit shall not be required to file a request for the payment of an Administrative Expense of the kind described in sections 503(b)(1)(B) or 503(b)(1)(C).  Notwithstanding the foregoing, an Allowed Administrative Expense may be paid on such other terms and conditions as are agreed to between the Reorganized Debtor or applicable Buyer and the holder of such Allowed Administrative Expense.

(b) <u>Treatment of Certain Accrued Expenses</u>.  Under each of the Transition Services Agreements, the Reorganized Debtor will continue following the Effective Date to conduct certain of its operations on behalf of the Buyers to facilitate the transition of operations from Broadstripe to the Buyers.  Certain Administrative Expenses, e.g., pole attachment expenses, property taxes, local franchise authority fees, etc., will have been incurred by the Debtors as of the Effective Date but will not be due for payment for an extended period of time after the Effective Date.  With respect to those accrued but unpaid expenses, the Buyers shall assume liability for such Administrative Expenses as of the Effective Date in accordance with the terms of each of the Purchase and Sale Agreements and Transition Services Agreements, and the Debtors' liability to Buyers for the portion of such Administrative Expenses that accrue prior to the Effective Date shall be governed by the terms of each of the Purchase and Sale Agreements and Transition Services Agreements.

(c) <u>Statutory Fees</u>.  All fees payable on or before the Effective Date (i) pursuant to 28 U.S.C. § 1930, and (ii) to the United States Trustee, shall be paid by the Debtors on or before the Effective Date.  All such fees payable after the Effective Date shall be paid by the Reorganized Debtor.

(d)    <u>Lenders' Fees and Expenses</u>.  Subject to the deadlines set forth herein, unless otherwise provided for herein or agreed to by the parties, all fees and expenses constituting Lender Expense Claims shall be paid in full in Cash in an amount equal to the unpaid portion of such Lender Expense Claims on or as soon as reasonably practicable after the later of: (i) the Effective Date applicable to the relevant Debtor; and (ii) the fifth day after such Lender Expense Claim is invoiced; *provided*, *however*, that nothing herein shall prohibit the Debtors from paying a Lender Expense Claim at an earlier time so long as such payment is made in accordance with the terms of the DIP Order.

(e)    <u>Administrative Expense Bar Date</u>.

(i)    Except as provided in Section 3.1(a), requests for payment of Administrative Expenses must be Filed (or, in the case of Lender Expense Claims and requests for payment of Administrative Expenses representing obligations incurred in the ordinary course of business, invoiced) no later than sixty (60) days after the Effective Date (the "<u>Administrative Expense Bar Date</u>").  Holders of Administrative Expenses that do not File or invoice such requests, as applicable, by such bar date shall be forever barred from asserting such Administrative Expenses against the Debtors, the Reorganized Debtor or any of their property.

(ii)    All Professionals or other entities requesting compensation and reimbursement of expenses pursuant to §§ 327, 328, 330, 331 or 503(b) for services rendered prior to the Effective Date shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date.  To the extent allowed, pre-Effective Date fees for services rendered and expenses incurred will be paid by the Reorganized Debtor.  Any professional fees and reimbursements or expenses incurred by the Reorganized Debtor subsequent to the Effective Date may be paid without application to the Bankruptcy Court.  To the extent Allowed, the foregoing fees and expenses will be paid by the Reorganized Debtor.

(iii)    Following the Effective Date, the Reorganized Debtors shall pay in cash, within thirty (30) days of receipt by the Reorganized Debtors of an invoice from Warren H. Smith & Associates, P.C. (the "<u>Fee Auditor</u>"), all reasonable fees and expenses of the Fee Auditor that are incurred after the Effective Date, without the need for any further authorization from the Bankruptcy Court.  In the event that the Reorganized Debtors object to payment of such invoice(s) from the Fee Auditor for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice(s) shall be paid by the Reorganized Debtors.

(iv)    Requests for payment of Administrative Expenses arising pursuant to § 503(b)(9) must be Filed no later than the deadline set forth in Section 3.1(e)(i), *supra*, or such earlier deadline as may be set by Final Order of the Bankruptcy Court.  Holders of such Administrative Expenses that do not File such requests by the foregoing bar date shall be forever barred from asserting such Administrative Expenses against the Debtors, the Reorganized Debtor or any of their property; provided, however, that the foregoing shall not prohibit or condition their ability to seek payment of such amount as a General Unsecured Claim against the Debtors or their Estates.

(f)      Post Effective Date.  On the Effective Date, Cash sufficient to fund the Wind-Down Budget shall be deposited by the Debtors in an interest-bearing, segregated account in accordance with Bankruptcy Rule 3020(a).  Such escrowed funds shall be used to pay the Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, Miscellaneous Secured Claims and Wind-Down Expenses.  The Net Distributable Cash remaining in such segregated account after paying all such amounts shall be distributed to the First Lien Agent for distribution to holders of First Lien Note Claims.  The $750,000 (subject to reduction at the election of the Required First Lien Lenders) in the Wind-Down Budget  that is to be used for contesting claims made under the Escrow Agreements will be held in a separate escrow account in accordance with the Escrow Agreements. Notwithstanding any other provision of this Plan, all fees, expenses and compensation arising after the Effective Date and due and payable to the Professionals retained by the Debtors or the Reorganized Debtor shall only be paid by the Reorganized Debtor.

3.2      *Treatment of Allowed DIP Claims.*

The DIP Claims are Allowed in full.  On the Effective Date, unless otherwise agreed by a holder of a DIP Claim, each holder of a DIP Claim shall receive on account of such Allowed DIP Claim payment in full in Cash of its Allowed DIP Claim.

**ARTICLE IV**
**SUBSTANTIVE CONSOLIDATION**

4.1      *Substantive Consolidation.*

(a)      As of the Effective Date, the assets, Claims and affairs of the Debtors and their respective Estates shall be substantively consolidated into the Estate of Broadstripe as of the Effective Date pursuant to § 105(a) for all purposes associated with Confirmation and consummation of the Plan, including for purposes of voting and Distribution. As a result of the substantive consolidation, on the Effective Date, all assets and liabilities of the Debtors and their Estates shall be deemed pooled for voting and Distribution purposes.  All assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of Broadstripe solely for purposes of the Plan.

(b)      Substantive consolidation of the Debtors shall constitute the *de facto* merger of the Debtors into Broadstripe.  Substantive Consolidation shall not affect distributions from any insurance policies or the proceeds of such policies.

(c)      In the event that the Bankruptcy Court does not order substantive consolidation, the Debtors reserve the right, with the prior written consent of the Required First Lien Lenders, to seek Confirmation of the Plan as to each Debtor individually or to withdraw as to any Debtor.  Subject to the requirements of § 1129, neither the Debtors' inability to obtain Confirmation of the Plan as to any Debtor nor the Debtors' election to withdraw the Plan as to any Debtor shall impair the Confirmation or consummation of the Plan as to any other Debtor.

HOUSTON 1103525v.26

4.2     *Request for Substantive Consolidation.*

Unless substantive consolidation has been approved by a prior order of the Bankruptcy Court, the Plan shall serve as a motion by the Debtors seeking entry of an order by the Bankruptcy Court substantively consolidating the Debtors and their Estates, and the Confirmation Order shall constitute an order of the Bankruptcy Court approving the substantive consolidation of the Debtors and their Estates.  In the event that the Bankruptcy Court substantively consolidates some but not all of the Debtors, the Debtors reserve the right to proceed with Confirmation with no or partial substantive consolidation consistent with the Bankruptcy Court's order.

4.3     *Intercompany Claims and Interests Among Debtors.*

(a)     <u>If Substantively Consolidated</u>.  If substantive consolidation is ordered pursuant to this Article IV, (i) no distributions shall be made under the Plan on account of any Intercompany Claim, Administrative Expense, or Interests between and among any of the Debtors, (ii) for all purposes associated with Confirmation, including, without limitation, for purposes of tallying acceptances and rejections of the Plan, the Estates of the Debtors shall be deemed to be one consolidated Estate for Broadstripe, and (iii) all guarantees of any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any Debtor shall be one obligation of the Debtors.

(b)     <u>If Not Substantively Consolidated</u>.  If substantive consolidation is not ordered pursuant to this Article IV, there shall be no Distributions made on account of any Intercompany Claim, Administrative Expense, or Interests between and among any of the Debtors.  Pursuant to §§ 1126(f) and 1126(g) of the Bankruptcy Code, holders of Intercompany Claims or Interests shall not be entitled to vote to accept or reject the Plan.

4.4     *Claims Between Debtors and Capital.*

No distributions shall be made under the Plan on account of any Intercompany Claim or Interests of the Debtors or Capital between, among or in any of the Debtors or Capital.  For all purposes associated with Confirmation, including without limitation, for purposes of tallying acceptances and rejections of the Plan all guarantees or claims for contribution or subrogation between the Debtors, individually or collectively, and Capital shall be eliminated.

4.5     *Tabulation of Votes.*

(a)     <u>If Substantively Consolidated</u>.  If the Debtors are substantively consolidated, the Debtors will tabulate votes on the Plan on a consolidated basis by Class for the purpose of determining whether the Plan satisfies §§ 1129(a)(8) or (10), as applicable, for the consolidated Debtor.  In that event, the Claims against and Interests in the Debtors shall be voted in single consolidated Classes (*e.g.*, holders of a Class 5 Claim) against any consolidated Debtor shall be deemed to have voted in a single, consolidated class for purposes of determining whether the Plan satisfies §§ 1129(a)(8) or (10), as applicable, with respect to each consolidated Debtor.

(b)      If Not Substantively Consolidated.    If the Debtors are not substantively consolidated, the Debtors will tabulate all votes on the Plan on a non-consolidated basis by Class for the purpose of determining whether the Plan satisfies §§ 1129(a)(8) or (10), as applicable, with respect to each Debtor.  For each Debtor that satisfies §§ 1129(a)(8) or (10), as applicable, and provided that all other requirements to Confirmation of the Plan are met, the Confirmation of this Plan as to such Debtor shall be deemed to occur by operation of the Plan.

4.6      *Reservation of Rights.*

In the event that the Bankruptcy Court does not order substantive consolidation of the Debtors, then except as specifically set forth in the Plan: (a) nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor; (b) Claims against multiple Debtors shall be treated as separate Claims with respect to each Debtor's Estate for all purposes (including, without limitation, Distributions and voting), and such Claims shall be administered as provided in the Plan; and (c) the Debtors shall not, nor shall they be required to, resolicit votes with respect to the Plan, nor will the failure of the Bankruptcy Court to approve substantive consolidation of the Debtors alter the Distributions set forth in the Plan.  In the event that the Bankruptcy Court does not order substantive consolidation, the Plan comprises a separate plan for each Debtor and the Confirmation requirements of § 1129 must be satisfied separately for each Debtor under the Plan.

**ARTICLE V**
**TREATMENT OF CLASSES OF CLAIMS AND INTERESTS**

The categories of Classes, Claims and Interests listed below classify Claims and Interests (other than Administrative Expenses dealt with in Article III) in or against the Debtors for all purposes, including voting, Confirmation, and Distribution, pursuant to the Plan and pursuant to §§ 1122 and 1123(a)(1).  If substantive consolidation is ordered pursuant to Article IV of the Plan, each Class listed below will vote as set forth in Article IV of the Plan.  If substantive consolidation is not ordered, each Class listed below shall vote as a single separate Class, including with respect to the Confirmation requirements under § 1129(b).  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and the remaining portion of such Claim or Interest, if any, shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  Section 3.1 of the Plan deals with payment of unclassified Administrative Expenses.

5.1      *Treatment of Allowed Class 1 Claims (Priority Non-Tax Claims).*

(a)      Unless otherwise agreed by the holder of an Allowed Priority Non-Tax Claim and the Debtors or, following the Effective Date, the Reorganized Debtor, each holder of an Allowed Priority Non-Tax Claim shall receive an amount in Cash equal to 100% of the Allowed amount of such Allowed Priority Non-Tax Claims on or as soon as practicable after

the later of: (i) the Effective Date or (ii) the date on which such Priority Non-Tax Claims becomes an Allowed Priority Non-Tax Claims.

(b)    Class 1 is Unimpaired, and holders of Class 1 Claims shall be deemed to have accepted the Plan.

5.2    *Treatment of Allowed Class 2 Claims (First Lien Note Claims).*

(a)    On the Effective Date and only after payment in full of all Lender Expense Claims, unless otherwise agreed by a holder of a First Lien Note Claim, each holder of an Allowed First Lien Note Claim shall receive on account of such Allowed Claim its Ratable Proportion of: (i) the Net Distributable Cash and (ii) the New Member Interests.  The First Lien Note Claims shall be Allowed Class 2 Claims in the amount of $181,019,925.46, plus accrued interest at the non default rate set forth in the First Lien Credit Agreement from the Petition Date through the Effective Date.

(b)    Upon dissolution, the Reorganized Debtor will assign all of its rights under the Purchase and Sale Agreements and Ancillary Agreements and all other residual property and property rights of the Reorganized Debtor to the First Lien Note Claim Trust, which shall be deemed to be the successor in interest to the Reorganized Debtor for purposes of enforcing any and all such rights.  The First Lien Note Claim Trust will be administered in accordance with the First Lien Note Claim Trust Agreement for the benefit of holders of Allowed First Lien Note Claims.

(c)    The First Lien Agent shall receive for the benefit of holders of Allowed First Lien Note Claims: (i) the Net Distributable Cash; and (ii) the New Member Interests and shall distribute to each holder of an Allowed First Lien Note Claim its Ratable Proportion of such amount and such New Member Interests as soon as practicable after the Effective Date.  Following the Effective Date, as additional amounts become Net Distributable Cash, as determined by the Sellers' Representative, such amounts shall be distributed to the First Lien Note Claim Trust for distribution to the holders of Allowed First Lien Note Claims in accordance with the terms of the First Lien Note Claim Trust Agreement.

(d)    Class 2 is Impaired, and holders of Class 2 Claims shall be entitled to vote to accept or reject the Plan.

5.3    *Treatment of Allowed Class 3 Claims (Non-Highland Second Lien Note Claims).*

(a)    <u>Non-Highland Second Lien Note Claims</u>.  On the Effective Date, holders of Non-Highland Second Lien Note Claims shall be entitled to receive their Ratable Proportion of the distributions from the Creditors' Trust and such amounts shall be distributed to the Second Lien Agent for the benefit of such holders.   The Non-Highland Second Lien Note Claims shall be Allowed in the aggregate amount of $10,347,271.

(b)    Class 3 is Impaired, and holders of Class 3 Claims shall be entitled to vote to accept or reject the Plan.

5.4    *Treatment of Allowed Class 4 Claims (Miscellaneous Secured Claims).*

(a)    On the Effective Date, each holder of an Allowed Miscellaneous Secured Claim shall receive on account of its Allowed Miscellaneous Secured Claim one of the following alternatives at the option of the Reorganized Debtor:

(i)    payment in full in Cash of its Allowed Miscellaneous Secured Claim;

(ii)    the Distribution of the Collateral securing such Allowed Miscellaneous Secured Claim, in which event such holder shall be entitled within thirty (30) days of such election to File a proof of Claim for any deficiency entitled to treatment as a Deficiency Claim in Class 5 or be forever barred from thereafter asserting a Deficiency Claim against any Debtor or the Reorganized Debtor; or

(iii)    such other treatment, including deferred Cash payments, as shall be consistent with § 1129(b).

(b)    Class 4 is Impaired, and holders of Class 4 Claims shall be entitled to vote to accept or reject the Plan.  Each Miscellaneous Secured Claim receiving treatment under this Section 5.4 shall be deemed to be in a separate Class for classification, voting and Distribution purposes.

5.5    *Treatment of Allowed Class 5 Claims (General Unsecured Claims).*

(a)    On the Effective Date, unless otherwise agreed by a holder of a General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall become entitled to receive its Ratable Proportion of distributions from the Creditors' Trust unless such holder votes against or objects to Confirmation of the Plan, opts out of or for any other reason is deemed by the Bankruptcy Court not to have consented to the releases in the Stipulation of Settlement or Section 8.2 of this Plan, in which case such holder will retain its rights otherwise released pursuant to the Stipulation of Settlement and Section 8.2 hereunder; but shall not receive any distribution from the Creditors' Trust other than its pro rata share of the proceeds of Avoidance Actions.

(b)    Class 5 is Impaired under the Plan, and holders of Class 5 Claims shall be entitled to vote to accept or reject the Plan.

5.6    *Treatment of Allowed Class 6 Claims (Highland Second Lien Note Claims).*

(a)    Holders of Highland Second Lien Note Claims, pursuant to the Stipulation of Settlement, shall not participate in or be a beneficiary of the Creditors' Trust. Accordingly, the holders of the Highland Second Lien Note Claims will not receive any Distributions or retain any property on account of their Claims against the Debtors.

(b)    Class 6 is Impaired under the Plan, and holders of Class 6 Claims shall be deemed to have rejected the Plan.

5.7    *Treatment of Allowed Class 7 Interests.*

(a)    The holders of Interests shall receive no Distributions of any kind under the Plan in respect of those Interests. The Interests in each of the Debtors shall be deemed cancelled and extinguished on the Effective Date.

(b)    Class 7 is Impaired under the Plan, and holders of Class 7 Interests shall be deemed to have rejected the Plan.

**ARTICLE VI**
**MEANS FOR IMPLEMENTATION OF THE PLAN INCLUDING TREATMENT OF**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means for implementation of this Plan.

6.1    *Sale of Assets and Assignment of Executory Contracts.*

(a)    <u>Sale Motion</u>.  This Plan is predicated on the sale of substantially all of the operating assets of the Debtors and the assignment of certain contracts, licenses and other agreements.  Accordingly, this Plan shall serve as a motion pursuant to §§ 1123(a)(5)(B);1123(b)(4); 363(b)(1) and 363(f) for authority to transfer the Transferred Assets free and clear of all such liens, claims, encumbrances and interests, except as may be otherwise provided in each of the Purchase and Sale Agreements, and the Confirmation of this Plan shall, subject to the occurrence of the Effective Date, constitute approval of such transfer.

(b)    <u>Overview</u>. The Debtors operate cable systems in three non-contiguous areas of the country, along with a call center servicing all three regions.  The separate regions are referred to as the Mid-Atlantic Region, the Midwest Region and the Northwest Region, which together with the call center, comprise all of the operating assets of Broadstripe. Additionally, there are third party services such as voice over internet protocol, which Broadstripe contracts for and in turn uses to provide service to all of its customers who purchase telephone services through Broadstripe (generally referred to as "VOIP" or "telephony" services).  Following the Effective Date, the Reorganized Debtor will furnish certain transition support services to the Buyers, as described in each of the Purchase and Sale Agreements, the exhibits thereto and the Ancillary Agreements.  At the conclusion of the transition period, the Reorganized Debtor will file appropriate resolutions for its dissolution and winding up of affairs. Because the only business that the Reorganized Debtor will be conducting will be providing transition services, and because all costs associated with those services will be reimbursed by the Buyers or provided for in the Wind-Down Budget, the Debtors do not anticipate incurring any unfunded third party obligations or liabilities, nor is it anticipated that there will be further need for reorganization, and the dissolution and winding up process are contemplated to be done pursuant to this Plan.

(c)    <u>Background</u>.  After an extensive marketing program, the Debtors received an acceptable offer to sell the systems to a coalition of two well-established cable companies which through affiliates would separately acquire each of the three Broadstripe

regions.  A form of the Purchase and Sale Agreement was negotiated along with certain support agreements and a separate Purchase and Sale Agreement, each with its own schedules, exhibits and attachments, has been executed by each of the Buyers.  The Bidding Procedures Order established a mechanism for possible third party bidders to submit competing offers for the Debtors' assets.  [Because no qualifying bidder submitted an offer better than what had been negotiated, the Debtors propose to sell their assets pursuant to each of the Purchase and Sale Agreements between the Debtors and Anne Arundel Broadband, LLC for the Mid-Atlantic Region; WideOpenWest Mid-Michigan, LLC for the Midwest Region and WaveDivision I, LLC for the Northwest Region.  True and correct copies of each of the Purchase and Sale Agreements are appended to this Plan as Exhibits A, B and C, respectively.] *[To be updated to reflect outcome of auction.]*

> (d)    Basic Terms of the Agreements. [2]

> **What follows is a synopsis of the Purchase and Sale Agreements that were negotiated over several months.  Those agreements are attached hereto as the Exhibits referenced in the preceding paragraph.  Readers are urged to refer to the contracts themselves, rather than merely rely on this summary.**

Collectively, the aggregate purchase price payable under the Purchase and Sale Agreements totals $95 million (the "Base Purchase Price"), subject to adjustments (the "Adjusted Purchase Price").  The Adjusted Purchase Price, minus the good faith deposit posted by the Buyers (collectively $10 million in the aggregate), will be paid by the Buyers on the Effective Date, *minus* the aggregate amount of $13.5 million, which will be deposited with a third party escrow agent by the Buyers in accordance with the Escrow Agreements, pending calculation of potential further purchase price adjustments based on number of subscribers actually delivered (other than for the Mid-Atlantic Region), working capital calculations, title defects, if any, along with a number of other adjustments as provided in the Purchase and Sale Agreements, the terms of which are substantially identical, except for the identities of the Buyers, price allocation and other region specific items.  Upon termination of the Escrow Agreements according to their terms, all then remaining amounts in the escrow accounts established thereunder shall be distributed to the First Lien Note Claim Trust for distribution to the holders of Allowed First Lien Note Claims in accordance with the terms of the First Lien Note Claim Trust Agreement.  Disputes over potential Purchase Price Adjustments are to be submitted to an independent accounting firm, thus no further involvement from the Bankruptcy Court is anticipated.  Because the Base Purchase Price is significantly less than even the First Lien Note Claims, the Estates have no financial interest with respect to any account(s) established under the Escrow Agreements.

The Stipulation of Settlement resolved extensive litigation brought by the Creditors' Committee on behalf of the Estates against Highland and the Highland managed lenders.  The Stipulation of Settlement provides a framework for the Debtors' exit from Chapter 11, and that framework is incorporated into this Plan.  Consistent with the Stipulation of Settlement, (i) the unsecured, non-Highland creditors will receive a Ratable Proportion of the proceeds from Avoidance Actions and, if deemed to grant releases in accordance with the Stipulation of

---

[2]   To be updated to reflect outcome of auction.

Settlement and Section 8.2, a Ratable Proportion of the Settlement Sum through the Creditors' Trust, (ii) all Interests in the Debtors will be cancelled, and (iii) the Net Distributable Cash and the New Member Interests will be distributed to the First Lien Agent for distribution to holders of First Lien Note Claims. The Stipulation of Settlement also provides that the secured lenders can, at their election, credit bid their debt or use the debt in a standalone plan of reorganization, but those First Lien Lenders party to the Stipulation of Settlement, which constitute the Required First Lien Lenders, have consented to the Plan, the Bidding Procedures Order and each of the Purchase and Sale Agreements, which contemplate a waiver of any right to credit bid in the context of the proposed auction.

On the Effective Date, the entirety of the Adjusted Purchase Price, less amounts required to be held in escrow under the Purchase and Sale Agreements and Escrow Agreements, shall be used, in accordance with the Wind-Down Budget (described below) to make payments under the Plan or to fund Wind Down Expenses. The Debtors shall immediately wire the Settlement Sum to the account designated by the Creditors' Trust representative, pursuant to the Stipulation of Settlement. The Debtors shall retain proceeds of sale in an amount which they determine to be sufficient to pay all Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, Miscellaneous Secured Claims and Wind-Down Expenses, and to fund a reserve for disputing claims of the Buyers under the Plan Documents, all as set forth in the wind-down budget (the "Wind-Down Budget"), a copy of which is attached hereto as Exhibit D, and shall remit the Net Distributable Cash to the First Lien Agent for distribution to holders of Allowed First Lien Note Claims. These payments and escrows shall be made on the Effective Date of the Plan or as soon thereafter as practicable.

(e)    Assets To Be Transferred. The Purchase and Sale Agreements provide for transfer of substantially all of the assets of the Debtors used in the business on a region-by-region basis (the "Transferred Assets") to the Buyers. However, certain of the Debtors' assets will not be included in the sales and will not be transferred to the Buyers (the "Excluded Assets"). The Excluded Assets are as follows (capitalized terms having the meanings assigned thereto in each of the Purchase and Sale Agreements):[3]

(i)    any Contract that does not constitute a Transferred Asset;

(ii)    all Tax assets (including duty and tax refunds and prepayments and any deposit or reserve with respect to Taxes) and net operating losses of Sellers;

(iii)    all Tax Returns of Sellers and all books and records (including working papers) related thereto;

(iv)    sponsorship of, all rights in connection with, and assets of the Benefit Plans;

---

[3] The list of Excluded Assets herein is qualified in its entirety by reference to each of the Purchase and Sale Agreements. Parties in interest should review each of the Purchase and Sale Agreements for a complete list of Excluded Assets.

(v)      all insurance policies and rights and claims thereunder;

(vi)      all credits, prepaid expenses, deferred charges, advance payments and prepaid items to the extent related to any asset that is not a Transferred Asset, and all security deposits and equipment rental deposits held by a third party for the account of any Seller;

(vii)      all personnel records, other than the personnel records of Transferred Employees; provided that Sellers may retain a copy of the personnel records of Transferred Employees to the extent required by applicable Law;

(viii)      all insurance proceeds which any Seller has a right to receive as of the Effective Date;

(ix)      the Intellectual Property set forth on Schedule IP of the Purchase and Sale Agreement;

(x)      causes of action, lawsuits, judgments, claims or demands related to any Excluded Assets or Excluded Liabilities or that become Excluded Assets pursuant to Section 2.1(a)(x) of each of the Purchase and Sale Agreements;

(xi)      all claims, causes of action, rights and/or remedies with respect to any and all potential and existing avoidance actions under Chapter 5 of the Bankruptcy Code, including all causes of action, rights and/or remedies arising under sections 502(d), 544, 547, 548, and 550 of the Bankruptcy Code or similar state or federal statute or common law arising from any payment or transfer made by or on behalf of any of Sellers, whether directly or indirectly;

(xii)      all claims, causes of action, rights and/or remedies released or to be released under that certain Stipulation of Settlement dated as of December 8, 2010, and filed as Exhibit A to Docket No. 1656 in the Bankruptcy Case, as modified and approved by that certain Order Granting Debtors' Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Compromise Among the Debtors, Committee, Committee Counsel, Highland, James Cable, and WaveDivision, and (B) Approving the Related Stipulation of Settlement (Bankruptcy Case Docket No. 1730);

(xiii)      all Excluded Actions;

(xiv)      all Launch Fees;

(xv)      all rights of Sellers under the Purchase and Sale Agreements and any Ancillary Agreements, and any documents delivered to or received by any of the foregoing in connection therewith;

(xvi)      all equity interests in any Subsidiary of any of Sellers;

(xvii)      all minute books, charter documents, equity issuance record books, registers of other securities, copies of original tax and financial records, and such other

books and records as pertain only to the organization, existence, capitalization or debt financing of Sellers;

(xviii) all cash, cash equivalents and marketable securities derived from or otherwise Related to the Business;

(xix)   all bank accounts of any Seller, including any lock box or deposit accounts (provided, that a Buyer may, with the consent of the applicable counterparty, assume Seller's lock box service agreement); and

(xx)   all other assets set forth on Schedule 2.2(t) of each of the Purchase and Sale Agreements (except to the extent such Excluded Assets are Transferred Assets in the Other Purchase and Sale Agreements).

(f)   <u>Assumption of Non-Contractual Liabilities</u>.  Each of the Purchase and Sale Agreements provides that only certain liabilities will be assumed by the applicable Buyer, and then only to the extent that those liabilities are included in the calculation of the Working Capital Adjustment Amount or the Assumed Closing Date Indebtedness (each as defined in the applicable Purchase and Sale Agreement).

(g)   <u>Assumption and Assignment of Unexpired Leases and Executory Contracts</u>.  Among the Transferred Assets to be conveyed are the Assumed Contracts.  On the Effective Date, the Assumed Contracts shall be assumed and assigned to the Buyers.  Separate Notice of Intent to Assume and Assign Executory Contract or Unexpired Lease will be served on all counterparties at least twenty (20) days prior to the Confirmation Hearing.  Pursuant to the Bidding Procedures Order, each counterparty to an unexpired lease or executory contract received a Notice of Cure Amount and was given an opportunity to object to such Cure Amount. For those contracts and leases to be assumed and assigned to the Buyers, the Debtors have either reconciled the Cure Amounts or are in the process of doing so with the counterparty.  To the extent there are billing differences which cannot be reconciled, the Debtors will seek a hearing to determine the amount of the Cure Amounts, with such hearing to occur not later than the Effective Date.  If any Entity Files an objection to the proposed assumption or assignment of an Assumed Contract based on any ground other than the adequacy of the Cure Amount for such Assumed Contract, and the Bankruptcy Court ultimately determines that the Debtors cannot assume such executory contract or unexpired lease or adequate assurance of future performance is not demonstrated, then the Debtors, with the consent of the Buyers, may change the status of such executory contract or unexpired lease and declare such contract or lease to be rejected pursuant to Section 6.1(h) hereof.

(h)   <u>Treatment of Rejected Contracts</u>.   Except for (i) Assumed Contracts and (ii) those Rejected Contracts listed in <u>Exhibit E</u> which are necessary for the Reorganized Debtor to meet its obligations under the Transition Services Agreements and/or Retained Franchise Management Agreements, all executory contracts and unexpired leases (other than those previously rejected pursuant to an order of the Bankruptcy Court) shall be deemed rejected on the Confirmation Date or such other date as may be agreed to by the Debtors, the Buyers and the counterparties thereto or ordered by the Bankruptcy Court, and the Debtors and respective counterparties shall be relieved of any further obligation to perform under such

Page 27

agreements.  With respect to those Rejected Contracts listed in <u>Exhibit E</u> which are necessary for the Reorganized Debtor to meet its obligations under the Transition Services Agreements [and/or Retained Franchise Management Agreements], such agreements shall be deemed rejected as of the Confirmation Date but the termination date for performance under the agreements shall not occur until the last day of the transition period under the Transition Services Agreements or such other date as may be agreed to by the Debtors, the Buyers and the counterparties thereto or ordered by the Bankruptcy Court.  Rejected Contract counterparties who do not oppose this proposed treatment by opposing confirmation of the Debtors' Plan by filing and serving a written objection with the Bankruptcy Court in accordance with the Bankruptcy Code, Bankruptcy Rules and local rules and/or orders of the Bankruptcy Court shall be deemed to have consented to the deferred termination date for their Rejected Contract.

(i)    <u>Approval of Assumptions, Rejections and Cure Amounts</u>.    This Plan shall constitute a request pursuant to Bankruptcy Code §§1123(b)(2) and 365(a) and the Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court approving (i) the assumption by the Reorganized Debtor, and assignment to the Buyers, of all of the Assumed Contracts, (ii) the approval of the rejection by the Debtors of the Rejected Contracts and (iii) to the extent not subject to dispute, the payment of the Cure Amounts.

(j)    <u>Payment Related to Assumption of Executory Contracts and Unexpired Leases</u>.  If not the subject of dispute pursuant to Section 6.1(g) hereof as of the Confirmation Date, any monetary defaults under each Assumed Contract shall be satisfied by the Debtors, pursuant to § 365(b)(1), by payment of the Cure Amounts or such other amount as ordered by the Bankruptcy Court or agreed upon by the Debtors in Cash within sixty (60) days following the Effective Date or on such other terms as agreed to by the parties to such Assumed Contract.  In the event of a dispute pursuant to Section 6.1(g), payment of the amount otherwise payable hereunder shall be made following entry of a Final Order or agreement by the Debtors or the Reorganized Debtor, as the case may be, and the party to such Assumed Contract.

(k)    <u>Bar Date for Rejection Damages</u>.    If the rejection of a Rejected Contract pursuant to this Section 6.1 gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be classified as a Class 5 General Unsecured Claim; provided, however, that any Claim arising from the rejection of a Rejected Contract pursuant to this Section 6.1 shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtor, the Creditors' Trust, their affiliates, their successors, estates, or their properties, unless a proof of Claim is Filed and served on the Debtors or the Reorganized Debtor within thirty (30) days after the Confirmation Date.  Any Rejection Claim arising from the rejection of a Rejected Contract pursuant to a Final Order other than the Confirmation Order and this Section 6.1 shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtor, the Creditors' Trust, their affiliates, their successors, estates, or their properties, unless a proof of Claim is Filed and served on the Debtors or the Reorganized Debtor within thirty (30) days after the entry of such Final Order or such earlier date as is specified in such Final Order.

(l)    <u>Contracts Entered Into on or After the Petition Date</u>.    On the Effective Date, all contracts, leases, and other agreements entered into by the Debtors on or after

the Petition Date, which agreements have not been terminated in accordance with their terms on or before the Confirmation Date, shall vest in, and remain in full force and effect as against, the Reorganized Debtor and the counterparties to such contracts, leases and other agreements, and, with respect only to postpetition Assumed Contracts, shall be assigned to the Buyers.

6.2    *General Company Matters.*

(a)    The Debtors will continue to operate their businesses pursuant to each Transition Services Agreement and each Retained Franchise Management Agreement as debtors in possession following the Effective Date. On the Effective Date, the assets and rights remaining in the Debtors' Estates will be substantively consolidated into the Reorganized Debtor pursuant to Article IV of the Plan, and all assets of the Estates will vest in the Reorganized Debtor.  The Debtors and the Reorganized Debtor shall take such action as is necessary to effect the terms and provisions of the Plan and the Plan Documents.  The Plan shall be administered by the Reorganized Debtor on behalf of the Debtors and all actions taken thereunder in the name of a Debtor shall be taken through the Reorganized Debtor or the applicable Debtor, if necessary.

(b)    On the Effective Date, the issuance of the New Members Interests, the election or appointment of directors and officers pursuant to this Plan and the Confirmation Order, and the other matters provided in this Plan involving the limited liability company structure of the Reorganized Debtor shall be deemed to have occurred and shall be in effect from and after the Effective Date without any requirement of further action by the members or directors of the Debtors or the Reorganized Debtor.

(c)    The Debtors, excluding Broadstripe, shall either be (i) wound down and dissolved as soon as practicable following the Effective Date or (ii) merged into Broadstripe pursuant to one or more Consolidation Transactions.

(d)    On the Effective Date or as soon as reasonably practicable thereafter, the bankruptcy case of Capital shall be converted from a Chapter 11 reorganization case to a Chapter 7 liquidation case upon Capital filing a notice of intent to convert with the clerk of the Bankruptcy Court.

6.3    *Corporate Governance.*

(a)    On the Effective Date, automatically and without further action, the winding down and dissolution of the Debtors, including the consummation of any Consolidation Transaction, shall become the general responsibility of the applicable Debtors and the Reorganized Debtor.

(b)    Notwithstanding the foregoing, on the Effective Date, the operation of the Reorganized Debtor shall become the general responsibility of its New Board of Managers.  The initial New Board of Managers shall be identified by the Required First Lien Lenders and disclosed by the Debtors not less than three (3) Business Days prior to the Confirmation Hearing.  Such managers shall be deemed elected or appointed, pursuant to the Confirmation Order, but shall not take office and shall not be deemed to be elected or appointed until the occurrence of the Effective Date.  Those managers and officers not continuing in office

shall be deemed to have resigned therefrom as of the Effective Date pursuant to the Confirmation Order.

### 6.4 *Effectiveness of Securities, Instruments and Agreements.*

On the Effective Date, the Reorganized Debtor shall be authorized to take all actions necessary to execute and deliver (to the extent not previously executed and delivered) each of (i) the Purchase and Sale Agreements, (ii) the Transition Services Agreements, (iii) the Retained Franchise Management Agreement; and (iv) the Escrow Agreements. On the Effective Date, the Reorganized Debtor shall be authorized to take all actions necessary to execute and deliver each of the other Plan Documents including, without limitation, (i) an Amended Operating Agreement, (ii) any documents, agreements or other matters contemplated in the Plan and (iii) any other agreement entered into or instrument issued or in connection with any of the foregoing or any other Plan Document.

### 6.5 *Approval of Agreements.*

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents, Creditors' Trust agreement and all transactions contemplated by this Plan. Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions and authorization for the Debtors or the Reorganized Debtor, as appropriate, to execute and deliver each of the Plan Documents, including, without limitation, each of the Purchase and Sale Agreements.

### 6.6 *Employee Benefit Plans.*

On the Effective Date, all of the Debtors' employee benefit plans, policies and programs shall be rejected without further action by the Debtors, the Reorganized Debtor or the Bankruptcy Court. Certain of the Debtors' employees will be offered employment positions with the Buyers similar to their current employment with the Debtors. Each of the Purchase and Sale Agreements specifies employee benefit plans which will be made available to all such transferred employees, as well as continuation coverage to be made available to the Debtors' employees who are not offered or who do not accept employment with the Buyers.

### 6.7 *Closing under the Purchase and Sale Agreement.*

Each of the Purchase and Sale Agreements provides that the consummation or "Closing" contemplated thereunder shall occur on the third business day (as defined therein) following the date that all necessary pre-closing conditions (other than those conditions that by their nature are to be satisfied at the Closing but subject to fulfillment or waiver of those conditions) specified in each of the Purchase and Sale Agreements have been satisfied or waived. The principal "Closing" conditions are summarized below. Parties in interest should review each of the Purchase and Sale Agreements for a complete description of the various conditions to Closing.[4]

       (a)      The transaction must not be prohibited by any law;

---

[4] Capitalized terms utilized in this Section 6.7 but not defined in Plan shall have the meanings ascribed to them in each of the Purchase and Sale Agreements.

(b)     The Bankruptcy Court must have approved and entered a Confirmation Order reasonably satisfactory to the Buyers and, unless waived by the Buyers, such order must have become a Final Order;

(c)     The sale transactions contemplated by this Plan and each of the Purchase and Sale Agreements must all close;

(d)     Any required regulatory approvals, as provided by each of the Purchase and Sale Agreements must be obtained;

(e)     All parties' representations and warranties shall be true and correct; covenants must have been performed; and Buyers and Sellers must have executed and delivered all ancillary agreements set forth in the Purchase and Sale Agreement;

(f)     Assumed Contracts being assigned to the Buyers must be satisfactorily assigned pursuant to the Confirmation Order (including payment of pre-petition arrearages) and satisfactory arrangements must have been reached for non-assigned contracts which the Debtors shall maintain to fulfill their obligations under each of the Transition Services Agreements;

(g)     Local franchising authority consent, where necessary, must be obtained for 95% of subscribers receiving cable service in each of the regions covered by each of the Purchase and Sale Agreements;

(h)     For each commercial broadcast television station specified in each of the Purchase and Sale Agreements, acceptable retransmission consent agreements must have been executed.

(i)     The Buyers have the right to obtain certain Phase I environmental reports.  Any such reports must show that the subject real property is free of hazardous material, except where the existence of any such material would not result in a "Material Adverse Effect" under the Purchase and Sale Agreements.

(j)     There can have been no change, event, development or occurrence that had or would reasonably be expected to have a negative impact on the business as more fully described in each of the Purchase and Sale Agreements.

(k)     Net2Phone Cable Telephony Services, LLC ("N2P") shall be subject to a binding obligation, which obligation will be documented in form and substance reasonably satisfactory to Buyers, to (i) continue to provide telephony services to telephony subscribers for a period of up to six (6) months following the Closing Date substantially in accordance with the terms of the agreement between Broadstripe and N2P, and (ii) reasonably cooperate with and provide to each Buyer such services on terms and conditions reasonably satisfactory to such Buyer as are necessary to migrate telephony subscribers from N2P's telephony service platform to such Buyer's telephony service platform without disruption to telephony subscribers as a consequence of such migration; provided, however, that, if such Buyer effects the Closing notwithstanding the failure of the condition set forth in Section 8.2(m)

Page 31

of the Purchase and Sale Agreements to be satisfied prior to the Closing, then such Buyer shall be deemed thereby to have waived, on behalf of itself and all of such Buyer's Buyer Indemnified Parties, any and all rights and remedies which such Buyer or any of such Buyer's Buyer Indemnified Party may have against Sellers and their Affiliates with respect to any Breach of any representation, warranty, covenant or agreement set forth in the Purchase and Sale Agreements or any Ancillary Agreement if and to the extent that such Breach is attributable to the failure of N2P to provide services as described in the condition set forth in Section 8.2(m) of the Purchase and Sale Agreements (the "N2P Waived Matter"), and such Buyer agrees not to, and agrees to cause all of such Buyer's Buyer Indemnified Parties not to, initiate or assert any claim, action or proceeding (whether under Article IX of the Purchase and Sale Agreements or otherwise) with respect to the N2P Waived Matter.

(l)     The System Operators shall have renewed or extended, on terms and conditions reasonably acceptable to the applicable Buyer, each of the agreements listed on Schedule 8.2(n) of the applicable Purchase and Sale Agreement.

(m)     Buyers shall have received evidence that (i) a Final Order approving the Rejection Motion (as defined in the Purchase and Sale Agreements) shall have been entered on the docket of the Bankruptcy Court, (ii) the counterparties to each Transition Contract (as defined in the Purachase and Sale Agreements) shall be subject to a binding obligation, which obligation will be documented in form and substance reasonably satisfactory to Buyers, to provide transition services for the period contemplated in the Transition Services Agreement with respect to such Transition Contract, and/or (iii) Sellers shall have assumed each Transition Contract and paid all costs, fees and expenses (including Cure Amounts) attributable to the assumption by Sellers of such Transition Contract in accordance with Section 7.14(h) of the Purchase and Sale Agreements, as applicable; provided, however, that, if an applicable Buyer effects the Closing notwithstanding the failure of the condition set forth in Section 8.2(o) of the Purchase and Sale Agreements to be satisfied prior to the Closing as to any one or more Transition Contracts (each, a "Waived Transition Contract"), then such Buyer shall be deemed thereby to have waived, on behalf of itself and all of such Buyer's Buyer Indemnified Parties, any and all rights and remedies which such Buyer or any of such Buyer's Buyer Indemnified Party may have against Sellers and their Affiliates with respect to any Breach of any representation, warranty, covenant or agreement set forth in the Purchase and Sale Agreements or any Ancillary Agreement if and to the extent that such Breach is attributable to the failure of a counterparty to a Waived Transition Contract to provide transition services as contemplated by Section 8.2(o) of the Purchase and Sale Agreements (the "Transition Contract Waived Matter"), and such Buyer agrees not to, and agrees to cause all of such Buyer's Buyer Indemnified Parties not to, initiate or assert any claim, action or proceeding (whether under Article IX of the Purchase and Sale Agreements or otherwise) with respect to the Transition Contract Waived Matter.

6.8     *Payment of Management Incentive Bonuses and Severance.*

On October 21, 2010 the Bankruptcy Court approved the Debtors' management incentive program, which provided for the payment of bonuses to certain key management employees in the event of a successful sale of the Debtors' businesses. Bonus payments to such personnel, except the CEO, under the incentive plan were capped at $446,000 in the aggregate and were to

be paid as listed in Exhibit F.

Some of the employees who would otherwise have been eligible to receive bonus payments under the approved management incentive plan are no longer employed by Broadstripe and will not receive any bonus. One key management employee that is still employed by Broadstripe was inadvertently excluded from the management incentive plan. Gustavo Prilick, Broadstripe's CEO, was only to be paid a bonus upon achieving certain sales price goals which proved to be unrealistic.

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor shall pay bonuses to key management personnel in accordance with the attached Exhibit G in an aggregate amount not to exceed $446,000, and commencing on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor shall pay severance pay to Gustavo Prilick equal to six month's salary, or $293,141, from the Effective Date in accordance with the general release agreement between Mr. Prilick and Broadstripe Holdings, LLC dated as of the Effective Date, which generally requires Mr. Prilick to remain available to assist with the winding down of the Debtors and the Reorganized Debtor, with responding to any claims by the Buyers under the Plan Documents and with the Reorganized Debtor's performance of its responsibilities under the Transition Services Agreement, in each case, as necessary during the nine-month transition period under the Transition Services Agreements.

6.9   *Distribution of Cash.*

(a)   The Reorganized Debtor or the Creditors' Trust, as applicable, shall make Cash Distributions to the holders of Allowed Claims on the terms set forth in Articles III and V of the Plan and/or the trust documents of the Creditors' Trust. Cash Distributions and other payments to be made pursuant to the Plan will be paid from proceeds of sale.

(b)   The Reorganized Debtor or the Creditors' Trust, as applicable, shall have no obligation to make a Distribution on account of an Allowed Claim if the aggregate amount of all Distributions to be made to the holder of such Allowed Claim is less than $50.00, except upon receiving a written request for such Distribution.

(c)   At the election of the Debtors or Reorganized Debtor, and with respect to General Unsecured Claims, the Creditors' Trust, any Cash payment to be made pursuant to this Plan may be made by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.

6.10   *Distribution of Equity Securities.*

(a)   On the Effective Date, the Reorganized Debtor shall authorize 10,000 units of New Members Interests and issue those units as set forth in Section 5.2 of the Plan.

(b)   The Reorganized Debtor is a successor to the Debtors for purposes of § 1145(a)(1), and is issuing the New Members Interest in exchange for Claims against the

Debtors, such that the New Members Interests issued pursuant to the Plan shall be subject to the safe harbor provisions of § 1145(a)(1).

6.11 *Implementation of Stipulation of Settlement, Including Third Party Releases.*

On the Effective Date, the remaining unperformed portions of the Stipulation of Settlement shall be put into place.

Pursuant to and consistent with the applicable provisions of the Stipulation of Settlement, the following steps shall be performed by the party indicated or shall otherwise occur:

(a) The Creditors' Committee shall establish the Creditors' Trust pursuant to the Creditors Trust Agreement which Agreement shall be consistent with the applicable provisions of the Stipulation of Settlement;

(b) As soon as reasonably possible after the Effective Date, the first proceeds of sale in the amount of $3,300,000 shall be funded by the Debtors into the Creditors' Trust, thereby triggering the Release Effective Date, and the Trustee shall begin making distributions therefrom within 20 days of the funding of the Creditors' Trust to holders of General Unsecured Claims that did not vote against or object to Confirmation of the plan or the Sale or were otherwise deemed by the Bankruptcy Court to have consented to the releases contained in the Stipulation of Settlement or Section 8.2 of this Plan;

(c) The right to pursue Avoidance Actions which are not released under the Stipulation of Settlement shall vest in the Creditors' Trust, as successor to the Creditors' Committee which is presently pursuing such actions on behalf of the Estates and the right to prosecute those actions shall vest in the Trustee. Proceeds of those actions shall be the property of the Creditors' Trust to be held and distributed pursuant to the terms of the trust agreement governing the Creditors' Trust and Section 4.e of the Stipulation of Settlement;

(d) James and Wave shall file, or be deemed to have filed if they have not already done so, the Amended Proofs of Claim (as defined in the Stipulation of Settlement) and each of James and Wave shall have Allowed Unsecured Claims in the amount of $20,000,000;

(e) The First Lien Pre-Petition Claims and the Second Lien Pre-Petition Claims (each as defined in the Stipulation of Settlement) shall be Allowed in full;

(f) Upon the Release Effective Date, the parties to the James Cable Adversary and the Committee Action (each as defined in the Stipulation of Settlement) shall take all actions to dismiss those cases with prejudice, and to the extent any challenge period or time to file a motion for reconsideration remains with respect to the Chancery Court Action (as defined in the Stipulation of Settlement), the parties to the Chancery Court Action shall waive such period or time with prejudice;

(g)     The parties to the Superior Court Action shall reserve all rights, claims and defenses and neither this Plan nor the Stipulation of Settlement may be used for any res judicata, estoppel, evidentiary or other preclusive effect in the Superior Court Action; and

(h)     The mutual releases provided in Section 12 of the Stipulation of Settlement and in Section 8.2 of this Plan shall become effective.

6.12    *Cancellation and Surrender of Existing Debt Instruments, Interests and other Securities.*

On the Effective Date, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the Interests and any options, warrants, calls, subscriptions, or other similar rights or other agreements or commitments, contractual or otherwise, obligating the Debtors to issue, transfer, or sell any Interest, shall be canceled and the holders thereof shall have no rights by reason thereof, and such instruments shall evidence no rights, except the right to receive the Distributions, if any, to be made to holders of such instruments under this Plan.

6.13    *Release of Liens and Perfection of Liens.*

Except as otherwise provided in the Plan, any Plan Document or the Confirmation Order: (a) each holder of a DIP Claim, a First Lien Note Claim, a Second Lien Note Claim, Miscellaneous Secured Claim or any other Secured Claim or judgment shall, except with respect to Collateral that is an Excluded Asset (as defined in the Purchase and Sale Agreements) and subject to payment in full of all DIP Claims, on the Effective Date, (i) turn over and release (or direct the DIP Agent, First Lien Agent or Second Lien Agent, as applicable, to turn over and release) to the Reorganized Debtor or the Buyers, as the case may be, any and all Collateral that secures or purportedly secures such Claim, as it pertains to the properties currently owned or leased by the Debtors or such Lien shall automatically, and without further action by the Debtors or Reorganized Debtor, be deemed released, and (ii) execute such documents and instruments as the Reorganized Debtor requests to evidence such Claim holder's release of such property or Lien; and (b) on the Effective Date, all right, title and interest in any and all property of the Estate which is an "Excluded Asset" under the Purchase and Sale Agreements shall revert or be transferred to the Reorganized Debtor subject to all Claims and Interests, including, without limitation, Liens, escrows, charges, pledges, encumbrances and/or security interests of any kind, and all right, title and interest in any and all property of the Estate which is a "Transferred Asset" under the Purchase and Sale Agreements shall be released and transferred to the applicable Buyer free and clear of all Claims and Interests.

6.14    *Restructuring Transactions.*

On or prior to the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtor, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Purchase and Sale Agreements and any Consolidation Transaction.  Without limiting the foregoing, any such transaction may include: (i) the execution and delivery of appropriate agreements, including an Amended Operating Agreement, or other documents of merger, consolidation, or reorganization containing terms that are consistent with

Page 35

the terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (iv) all other actions that such Debtors and the Reorganized Debtor determine are necessary or appropriate, including the making of filings or recordings in connection with any Consolidation Transaction. In the event a Consolidation Transaction is a merger transaction, upon the consummation of such Consolidation Transaction, the merged party shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor to such merger shall assume and perform the obligations of each constituent Debtor pursuant to the Plan. Implementation of the Consolidation Transactions shall not affect any Distributions, discharges, exculpations, releases, or injunctions set forth in the Plan.

## ARTICLE VII
## DISPUTED CLAIMS, DISPUTED INTERESTS, AND MISCELLANEOUS DISTRIBUTION PROVISIONS

7.1     *Objections.*

Objections, if any, to the allowance of Claims (excluding objections to the allowance of Administrative Expenses) other than Claims that have been previously Allowed or are Allowed pursuant to this Plan may be Filed by the Debtors or the Reorganized Debtor or, in the case of General Unsecured Claims, the Creditors' Trust, at any time on or before the Claim Objection Deadline. The "Claim Objection Deadline" shall be the later of (a) the 120th day following the Effective Date, unless such period is extended by order of the Bankruptcy Court, (b) thirty (30) days after the Filing of the proof of such Claim or Interest to which the objection is directed or (c) such other date set by order of the Bankruptcy Court (the application for which may be made on an *ex parte* basis). Any such objection shall be filed and served in accordance with the Bankruptcy Code, the Bankruptcy Rules and the local rules of the Bankruptcy Court.

7.2     *Amendments to Claims; Claims Filed After the Confirmation Date.*

Except as otherwise provided in this Plan or an order of the Bankruptcy Court, after the Confirmation Date, no proof of Claim may be Filed or amended except to decrease the Face Amount thereof of such Claim. Unless otherwise provided for herein or order of the Bankruptcy Court, any new or amended Claim Filed after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Debtors or Reorganized Debtor.

7.3     *Reserves and Estimations.*

(a)     In determining the amount of Distributions to be made under the Plan to the holders of Allowed Claims, appropriate reserves shall be established on account of Disputed Claims pending a determination of whether such Disputed Claims shall be Allowed. No Distributions will be made on a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

(b)     Upon a request for estimation by the Debtors, the Reorganized Debtor or the Creditors' Trust, the Bankruptcy Court will determine what amount of Cash from the initial and subsequent Distributions is sufficient to reserve on account of any Disputed Claim not otherwise treated in the Plan, pursuant to § 502 or other applicable law, in which event the amount so determined will be deemed the Allowed amount of such Disputed Claim for purposes of this Plan, or, in lieu thereof, the Bankruptcy Court will determine the maximum amount for such Disputed Claim, which amount will be the maximum amount in which such Claim may ultimately be Allowed, if such Claim is Allowed in whole or in part.   If the Debtors, the Reorganized Debtor or the Creditors' Trust elect not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is liquidated, the Reorganized Debtor or the Creditors' Trust, as applicable, will reserve Cash based on the Face Amount of such Claim until the Claim is Allowed by an order of the Bankruptcy Court, at which time the reserve amount pending a Final Order may be the amount so Allowed.

7.4     *Undeliverable or Unclaimed Distributions.*

(a)     If a holder of an Allowed Claim in a Class other than Class 5 fails to negotiate a check issued to such holder pursuant to this Plan within ninety (90) days of the date such check was forwarded to such holder, the Reorganized Debtor shall issue a "stop payment order" for that non-negotiated check.   The amount attributable to that non-negotiated check shall be deemed vested in the Reorganized Debtor, and the payee of such check and holder of such Claim shall be deemed to have no further Claim and will not participate in any further Distributions under this Plan.

(b)     The Creditors' Trust shall govern the treatment of funds unclaimed by holders of Allowed Claims in Class 3 and Class 5.

(c)     If a Distribution under this Plan to any holder of an Allowed Claim in a Class other than Class 5  is returned to the Reorganized Debtor due to an incorrect address and such holder does not present itself within ninety (90) days of the date such check was forwarded to said holder, the amount of cash attributable to such check will be deemed vested in the Reorganized Debtor, and the payee of such check and holder of such Claim shall be deemed to have no further Claim and will not participate in any further Distributions under this Plan

7.5     *Transmittal of Distributions and Notices.*

(a)     Any property or notice other than Cash Distributions made through Section 7.4 which an Entity is or becomes entitled to receive pursuant to the Plan shall be delivered by regular mail, postage prepaid, in an envelope addressed to that Entity at the address indicated on any notice of appearance Filed by that Entity or his authorized agent prior to the Effective Date.   If no notice of appearance has been Filed, notice shall be sent to the address indicated on a properly Filed proof of Claim or, absent such a proof of Claim, the address that is listed on the Schedules for that Entity.   The date of Distribution shall be the date of mailing, and property distributed in accordance with this Section shall be deemed delivered to such Entity regardless of whether such property is actually received by that Entity.

(b)       A holder of a Claim or Interest may designate a different address for notices and Distributions by notifying the Debtors or the Reorganized Debtor of that address in writing.  The new address shall be effective upon receipt by the Debtors or the Reorganized Debtor, as applicable.

7.6     *Withholding Taxes.*

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions hereunder.  All Entities holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

7.7     *Retention of Rights to Pursue Causes of Action.*

Pursuant to § 1123(b)(3), the Creditors' Trust (as representative of the Debtors' Estates) shall retain and have the exclusive right to enforce against any Entity any and all Claims and Causes of Action (including, without limitation, all Chapter 5 Causes of Action) that arose before the Effective Date, including all Causes of Action of a trustee and a debtor in possession under the Bankruptcy Code, other than those expressly released or compromised as part of or pursuant to the Stipulation of Settlement.  The Causes of Action retained by the Reorganized Debtor include, without limitation, all claims and Causes of Action listed on Appendix 3 to the Disclosure Statement.

Pursuant to the Stipulation of Settlement, Avoidance Actions were assigned to, and shall vest in the Creditors' Trust, on the Release Effective Date.

Because the limitations periods under § 546(a) were set to expire on January 1, 2011, the Committee and Debtors entered into the *Stipulation Assigning the Right to prosecute Certain of the Debtors' Claims to the Official Committee of Unsecured Creditors* (Exhibit A to Docket No. 1672) which was approved by the *Order Approving Resolution of the Motion of the Official Committee of Unsecured Creditors for Entry of an order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* (Docket No. 1672) which was entered by the Bankruptcy Court on December 13, 2010.  That Order enabled the Committee to file the Avoidance Actions derivatively on behalf of the Estates.  The Avoidance Actions and proceeds thereof will vest in the Creditors' Trust under the Plan and the Stipulation of Settlement.

A number of Avoidance Actions were filed under seal.  Because several defendants to Avoidance Actions will either obtain releases under the Plan or the Stipulation of Settlement or have their contracts assumed, some of those Avoidance Actions will be dismissed.

## ARTICLE VIII
## DISCHARGE, RELEASES AND INDEMNIFICATION

8.1     **Discharge**.

*Except as otherwise specifically provided by this Plan, the Confirmation Order (subject to the occurrence of the Effective Date) shall discharge the Reorganized Debtor from any debt*

Page 38

*that arose before the Confirmation Date, and any debt of the kind specified in §§ 502(g), 502(h) or 502(i) , whether or not a proof of Claim is Filed or is deemed Filed, whether or not such Claim is an Allowed Claim, and whether or not the holder or such Claim has voted on this Plan.*

8.2    ***Releases***.

(a)    *Except as otherwise specifically provided by the Plan, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date) of (i) all Claims and Causes of Action against, liabilities of, liens on, obligations of and Interests in the Debtors, the Reorganized Debtor, the Creditors Trust and the assets and properties of the Debtors, the Reorganized Debtor or the Creditors' Trust, whether known or unknown, and (ii) all Causes of Action (whether known or unknown, either directly or derivatively through any Debtor or the Reorganized Debtor) against, Claims (as defined in § 101 of the Bankruptcy Code) against, liabilities (as guarantor of a Claim or otherwise) of, Liens on the direct or indirect assets and properties of, and obligations of successors and assigns of, the Debtors, the Reorganized Debtor, the Creditors' Trust based on the same subject matter as any Claim or Interest or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was Filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan.*

(b)    *On the Effective Date, the Debtors and the Reorganized Debtor shall be deemed to release unconditionally, and hereby are deemed to release unconditionally on such date (i) each officer, director, employee, consultant, financial advisor, crisis and turnaround manager, attorney, accountant and other representatives of the Debtors and their respective directors, officers, members, owners, agents, employees and subcontractors, (ii) the Entities serving on the Creditors' Committee and, solely in their capacity as members or representatives of the Creditors' Committee, each consultant, attorney, accountant or other representative or member of the Creditors' Committee, (iii) the Lenders and, solely in their capacity as representatives of such Lenders, each of such Lender's respective officers, directors, shareholders, partners, agents, employees, consultants, attorneys, accountants, advisors, affiliates and other representatives and (iv) the Buyers (except with respect to each of the Purchase and Sale Agreements, Transition Services Agreements, Retained Franchise Management Agreements, Escrow Agreements and any other agreements related to the transactions described in any of the foregoing) (the Entities specified in clauses (i) through (iv) are referred to collectively as the "Releasees"), from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon or related to any act or omission, transaction, event or other occurrence taking place on or at any time prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtor, the Chapter 11 Case or the Plan, except that no Releasees shall be released from acts or omissions which are the direct result of such Releasee's criminal misconduct or intentional fraud, as determined by Final Order of a court of competent jurisdiction.*

(c)     ***Mutual Releases of and by Parties to the Stipulation of
Settlement***.  *Upon the occurrence of the Release Effective Date, each party to the Stipulation of
Settlement, on behalf of itself and its respective affiliates, successors and/or assignees
(including, in the case of the Creditors Committee, the Trustee), hereby fully and forever
releases and forever discharges each other party to the Stipulation of Settlement, NexBank,
Barrier, BoNY, Fleet, Bank of America, each of their and its respective successors in interest,
each of their and its respective affiliates, and each of their and its respective present and former
officers, directors, stockholders, employees, agents, counsel and representatives, from all claims,
causes of action, rights and/or remedies with respect to all matters relating to the Debtors
(including any claims, causes of action, rights and/or remedies with respect to payment of fees
and expenses of any counsel to any of the parties to the Stipulation of Settlement), including
without limitation the Bankruptcy Cases, the Committee Action, the Chancery Court Action, the
James Cable Claims, and the James Cable Adversary (each as defined in the Stipulation of
Settlement); provided, however, that Wave does not release the Highland Wave Defendants from
any claims that have been asserted by Wave in the Wave Superior Court Complaint in the
Superior Court Action, and, except as set forth in the last sentence of Section 4.d. of the
Stipulation of Settlement, all defenses of the Highland Wave Defendants are preserved.  For the
avoidance of doubt, the releases by the Creditors Committee contained within Section 12 of the
Stipulation of Settlement and this Section 8.2 are limited to estate causes of action which the
Creditors Committee has asserted or could assert on behalf of the bankruptcy estates, and shall
not impact, impair, or diminish any direct claims or causes of action which any unsecured
creditors may have individually.  Nothing contained in Section 12 of the Stipulation of Settlement
and this Section 8.2 shall be construed to release or limit any right of any party to the Stipulation
of Settlement to pursue any cause of action against any other party to the Stipulation of
Settlement for breach of the Stipulation of Settlement.  In addition, neither the Creditors
Committee nor the Debtors shall assign to the Trustee any claims, causes of action, rights and/or
remedies with respect to any matters relating to the Debtors that they have or may have against
any of NexBank, Barrier, BoNY, Fleet, Bank of America, Highland, each of their and its
respective successors in interest, each of their and its respective affiliates, and each of their and
its respective present and former officers, directors, stockholders, employees, agents, counsel
and representatives.*

(d)     *On the Effective Date, holders of General Unsecured Claims and
Non-Highland Second Lien Note Claims who consent to the releases in this Section 8.2 by
marking the appropriate box on their respective ballots shall also have consented to a release of
any individual claims, causes of action, rights and/or remedies they may hold against each of the
Debtors, NexBank, Barrier, BoNY, Fleet, as agent or administrative agent (including, without
limitation, Bank of America, as successor to Fleet) and its successors in interest as agent or
administrative agent, and Highland, each of their respective affiliates, and each of their and its
respective present and former officers, directors, stockholders, employees, agents, counsel and
representatives, from any and all claims, causes of action, rights and/or remedies with respect to
all matters relating to the Debtors, including, without limitation, a release of all claims, causes
of action, rights and/or remedies in the Committee Action and release of all claims, causes of
action, rights and/or remedies, with respect to any and all potential and existing Avoidance
Actions; provided, however, that these releases shall not apply, and no distributions of the
Settlement Sum from the Creditors' Trust shall be made, to any holder of a General Unsecured*

*Claim or Non-Highland Second Lien Note Claim that fails to vote on, votes against, or objects to Confirmation of, the Plan or that opts out of the releases provided for in this Section 8.2 by checking the appropriate box on their respective Ballot(s) or that is for any other reason deemed by the Bankruptcy Court not to have consented to the releases in the Stipulation of Settlement or this Section 8.2, provided further, that Wave shall not be required to release any claims, causes of action, rights and/or remedies that have been asserted in the Wave Superior Court Complaint in the Superior Court Action in order to receive its pro rata share of the Settlement Sum.*

     (e)  The foregoing release provisions are an integral part of this Plan and are essential to its implementation.  If and to the extent that the Bankruptcy Court concludes that the Plan cannot be confirmed with any portion of the foregoing releases, the Debtors, with the consent of the Required First Lien Lenders, reserve the right to amend the Plan so as to give effect as much as possible to the foregoing releases, or to delete them.

    8.3  *Indemnification.*

    *The Debtors and their Estates shall, to the fullest extent permitted by law, indemnify and hold harmless their managers, officers, agents, representatives, attorneys, crisis and turnaround managers, professionals and employees (each an "Indemnified Party"), from and against any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to, attorneys' fees and costs, arising out of or due to their actions or omissions with respect to the implementation or administration of the Plan; provided, however, the foregoing provisions of this Article 8.3 shall have no effect on the liability of any entity that results from such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.*

    8.4  *Creditors' Committee Termination.*

   On the Effective Date, the Creditors' Committee shall be dissolved, except with respect to, and to the extent of , any application for final compensation or reimbursement of expenses of Creditors' Committee members,  and the members, employees, agents, advisors, affiliates and representatives (including, without limitation, attorneys, financial advisors, and other Professionals) of each thereof shall thereupon be released from and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from and in connection with or related to the Chapter 11 Case.

### ARTICLE IX
### CONDITIONS TO OCCURRENCE OF THE EFFECTIVE DATE

    9.1  *Conditions to Occurrence of the Effective Date.*

   For each Debtor, the following are conditions precedent to the occurrence of the Effective Date:[5]

---

[5] Parties in interest should review each of the Purchase and Sale Agreements for a complete description of the various conditions to Closing.

(a)     The Confirmation Order shall have been entered in form and substance satisfactory to the Debtors, the Required First Lien Lenders, and it shall not have been modified or amended without the prior written consent of the Required First Lien Lenders, and, unless waived by the Buyers, shall have become a Final Order.

(b)     All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(c)     The Debtors and the Required First Lien Lenders shall have approved each of the Plan Documents, and such Plan Documents shall have been executed in accordance with their terms.

(d)     No injunction or regulatory order shall exist which could prohibit or interfere in any manner with the transfer to or assumption by the Reorganized Debtor of any franchises or licenses.

(e)     All reserves required to be established on or prior to the Effective Date shall have been funded pursuant to Section 3.1(f) of the Plan.

(f)     The total amount of Net Distributable Cash to be distributed to holders of Allowed First Lien Note Claims on or immediately following the Effective Date shall be at least $57,500,000, or such lesser amount as is consented to in writing by the Required First Lien Lenders.

(g)     The Closing (as defined in each of the Purchase and Sale Agreements) shall occur simultaneously with the occurrence of the Effective Date.

(h)     No Miscellaneous Secured Claims shall be Allowed, unless consented to by Required First Lien Lenders.

9.2     *Waiver of Conditions to Occurrence of the Effective Date.*

The Debtors may waive one or more of the conditions to the occurrence of the Effective Date with the consent of the Required First Lien Lenders.

## ARTICLE X
## EFFECTS OF PLAN CONFIRMATION

10.1     *Binding Effect.*

Upon Confirmation and pursuant to § 1141(a), the provisions of the Plan shall bind the Debtors, the Creditors' Committee, the Lenders and all Creditors and Interest holders, including their successors and assigns, whether or not they vote to accept the Plan.  The Claims and Distributions under the Plan to Creditors and Interests holders are in full and complete settlement of all Claims and Interests.

10.2    *Reorganized Debtor.*

Broadstripe shall, as the Reorganized Debtor, continue to exist after the Effective Date as a separate Entity, with all the powers of a limited liability company under applicable law, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

10.3    *Vesting of Property.*

Except as otherwise specifically provided in this Plan or the Stipulation of Settlement, pursuant to §§ 1123(a)(5) and 1141, all property comprising the Estate shall vest in the Reorganized Debtor or its successor, free and clear of all Claims, Liens, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date.  As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses, or related support services after the Effective Date without any application to the Bankruptcy Court.

10.4    ***Injunction***.

*Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that all Entities who have held, hold or may hold Claims against or Interests in any Debtors are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtor, the Creditors' Trust, the Creditors' Committee, any member of the Creditors' Committee, any of their professionals, any direct or indirect successor in interest to the Debtors; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order against the Debtors, the Reorganized Debtor, the Creditors Trust, the Creditors' Committee, any member of the Creditors' Committee, any of their professionals, or any direct or indirect successor in interest to, the Debtors; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtor, the Creditors' Trust, the Creditors' Committee, any member of the Creditors' Committee, any of their professionals, or any successor in interest to, any of the foregoing Entities; (d) asserting any right of setoff or subrogation of any kind, directly or indirectly, against any obligation due the Debtors, the Reorganized Debtor, the Creditors' Trust, the Creditors' Committee, any member of the Creditors' Committee, any of their professionals, or any successor in interest to the Debtors; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.  Furthermore, except as otherwise expressly provided in the Plan, for the consideration described in the Plan, as of the Effective Date, all Entities who have held, hold or may hold claims released pursuant to Section 8.2 above, whether known or*

Page 43

*unknown, and their respective agents, attorneys and all others acting for or on their behalf, shall be permanently enjoined on and after the Effective Date, with respect to any claim released pursuant to Section 8.2 above, from (a) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any claim against any Released Party or the property of any Released Party; (b) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against any Released Party or the property of any Released Party; (c) creating, perfecting or enforcing any encumbrance of any kind against any Released Party; (d) asserting any setoff or right of subrogation of any kind against any obligation due to any Released Party; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan. In the event that any Entity takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this Section or Section 8.2 above, then, upon notice to the Bankruptcy Court, the action or proceeding in which the claim of such Entity is asserted shall automatically be transferred to the Bankruptcy Court for enforcement of the provisions of this Section 10.4 and Section 8.2 above.*

## ARTICLE XI
## ADMINISTRATIVE PROVISIONS

11.1    *Retention of Jurisdiction.*

Notwithstanding entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

(a)    to determine (i) any Disputed Claims, Disputed Interests and all related Claims accruing after the Confirmation Date including rights and liabilities under contracts giving rise to such Claims, (ii) the validity, extent, priority and nonavoidability of consensual and nonconsensual Liens and other encumbrances, (iii) preconfirmation tax liability pursuant to § 505, and (iv) controversies and disputes regarding the interpretation of the Plan and documents executed in connection therewith;

(b)    to allow, disallow, estimate, liquidate or determine any Claim or Interest against the Debtors and to enter or enforce any order requiring the Filing of any such Claim or Interest before a particular date;

(c)    to approve all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease of the Debtors pursuant to § 365 and Article VI hereof;

(d)    to determine requests for payment of Administrative Expenses entitled to priority under § 507(a)(1), including compensation of parties entitled thereto;

(e)    to resolve controversies and disputes regarding the interpretation and implementation of this Plan, any disputes relating to whether or not a timely and proper proof of Claim was Filed or whether a Disallowed Claim or Disallowed Interest should be reinstated;

(f)    to implement the provisions of this Plan and entry of orders in aid of Confirmation and consummation of this Plan, including any disputes concerning the enforceability or applicability of the releases and injunctions contained herein;

(g)    to modify the Plan pursuant to § 1127;

(h)    to adjudicate any and all Causes of Action that arose in this Chapter 11 Case preconfirmation or in connection with the implementation of this Plan, whether or not pending on the Confirmation Date, including without limitation, any remands of appeals;

(i)    to resolve disputes concerning any reserves with respect to Disputed Claims, Disputed Interests or the administration thereof;

(j)    to resolve controversies and disputes regarding the interpretation and implementation of each of the Purchase and Sale Agreements and other related sale documents consistent with the terms of such agreements and documents;

(k)    to resolve any disputes concerning whether a person or entity had sufficient notice of the Chapter 11 Case, the applicable Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(l)    to determine any and all applications, Claims, Interests, pending adversary proceedings and contested matters (including, without limitation, any adversary proceeding or other proceeding to recharacterize agreements or reclassify Claims or Interests) in this Chapter 11 Case;

(m)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(n)    to seek the issuance of such orders in aid of execution of the Plan, to the extent authorized by § 1142;

(o)    to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(p)    to recover all assets of the Debtors and property of the Estate, wherever located, including any Chapter 5 Causes of Action;

(q)    to hear and resolve matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146;

(r)    to hear any other matter not inconsistent with the Bankruptcy Code;

(s)    to resolve any and all disputes or controversies relating to Distributions to be made, and/or reserves or escrows to be established, under this Plan;

(t)    to enter a final decree closing the Chapter 11 Case;

(u)    to enforce the injunction granted under Section 10.4 of the Plan;

(v)    to approve settlements relating to the above.

Notwithstanding the jurisdiction retained in this Section 11.1, from and after the Effective Date, the Bankruptcy Court shall not have the power to issue any order which modifies the New Member Interests or the rights of the holders thereof with respect to such New Member Interests.

11.2    *Cram Down.*

If all of the applicable requirements for Confirmation of the Plan are met as set forth in § 1129(a) except for subsection (8) thereof, the Debtors may request the Bankruptcy Court to confirm the Plan pursuant to § 1129(b), notwithstanding the requirements of § 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to any Impaired Class that does not vote to accept this Plan as described in the Disclosure Statement.

11.3    *Modification of the Plan.*

The Debtors reserve the right to alter, amend or modify the Plan with the consent of the Required First Lien Lenders prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, with the consent of the Required First Lien Lenders, the Debtors may, upon order of the Bankruptcy Court, alter, amend or modify the Plan in accordance with § 1127(b), or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

11.4    *Set-offs.*

Except as otherwise provided in the Plan, agreements entered into in connection with the Plan, the Confirmation Order, or in agreements previously approved by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtor may, but will not be required to, setoff against any Claim and the Distributions made with respect to the Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtor may hold against the holder of such Claim; *provided*, *however*, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, any other action or omission of the Debtors or the Reorganized Debtor, nor shall any provision of the Plan constitute a waiver or release by the Debtors or the Reorganized Debtor of any such claims, rights and Causes of Action that the Debtors or the Reorganized Debtor may possess against such holder.  To the extent the Reorganized Debtor fails to setoff against a holder of a Claim or Interest and seek to collect a claim from the holder of such Claim or Interest after a Distribution to the holder of such Claim or Interest pursuant to the Plan, the Reorganized Debtor shall be entitled to full recovery on its claim against the holder of such Claim or Interest.

11.5    *Compromise of Controversies.*

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of any such compromise or settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Reorganized Debtor and the Estates.

11.6    *Acceptance by Secretary of State.*

The Confirmation Order shall be deemed to satisfy the requirements of any state or federal office or agency pertaining to the amendment, dissolution or termination of any of the Debtors.

11.7    *Withdrawal or Revocation of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if the Confirmation Date does not occur, the Plan shall have no force or effect.

11.8    *Successors and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and assigns of such Entity.

11.9    *Governing Law.*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

11.10    *Notices.*

All notices, requests or demands for payments provided for in this Plan shall be in writing and shall be deemed to have been received, by mail, if addressed to:

    (a)    The Debtors:

        Broadstripe, LLC
        13455 Noel Road, Suite 1310
        Dallas, TX  75240
        Attention:  Reece Fulgham

        with copies to its counsel:

Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, TX  77002
Telephone:  (713) 276-5500
Facsimile:  (713) 276-5555
Attention:  John P. Melko

(b)      The Creditors' Trust

NHB Advisors, Inc.
Ted Gavin, CTP
919 N. Market Street, Suite 1410
Wilmington, DE 19801
Telephone: (302) 655-8997 x. 151

Any of the above may, from time to time, change its address for future notices and other communications hereunder by Filing a notice of the change of address with the Bankruptcy Court.  Any and all notices given under this Plan shall be effective when received.

11.11   *No Admissions.*

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

11.12   **Exculpation**.

*None of the Debtors, the Reorganized Debtor, the Creditors' Committee, the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, the Buyers, nor any of their respective officers, directors, partners, employees, members, agents, advisors, crisis and turnaround managers, affiliates, underwriters or investment bankers, nor any other professional persons employed by any of them (collectively, the "Exculpated Persons"), shall have or incur any liability to any Entity for any act taken or omission made in connection with or related to formulating, negotiating, implementing, confirming or consummating the Plan, the Disclosure Statement or any Plan Document.  The Exculpated Persons shall have no liability to the Debtors, the Reorganized Debtor, any holder of a Claim, any holder of an Interest, any other party in interest in the Chapter 11 Case or any other Entity for actions taken or not taken under the Plan, in connection herewith or with respect thereto, or arising out of their administration of the Plan or the property to be distributed under the Plan, in good faith, including, without limitation, failure to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that that this provision shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct. Notwithstanding the foregoing, nothing in the Plan shall limit the liability of the Buyers, if any, under the terms of the Purchase and Sale Agreements, Transition Services*

Page 48

*Agreements, Retained Franchise Management Agreements, Escrow Agreements and any other agreements related to the transactions described in any of the foregoing.*

> **BROADSTRIPE, LLC**
> **MDM SYSTEMS NORTHWEST, L.L.C.**
> **SUMMIT CABLEVISION L.P.**
> **CP NW1, L.L.C.**
> **CP NW2, L.L.C.**

By: _____
      Name:  Reece Fulgham
      Title:  Chief Restructuring Officer

HOUSTON 1103525v.26